John FOX, Appellant,

v.

Judy PARKER and Baylor University, Appellees.

No. 10–99–370–CV.

Court of Appeals of Texas, Waco.

Jan. 15, 2003.

Rehearing Overruled March 12, 2003.

Lanelle L. McNamara, McNamara & McNamara, Joe Olson, Waco, for Appellant.

Les Palmer and Alfred Mackenzie, Haley & Davis, P.C., Larry O. Brady and Stuart Smith, Naman, Howell, Smith & Lee, P.C., Waco, for Appellees.

Before Chief Justice DAVIS, Justice VANCE, and Justice CUMMINGS.

## OPINION

BILL VANCE, Justice.

This is an employment dispute. John Fox, a professor at Baylor University whose tenure was threatened, first sued one of the witnesses against him for defamation. After his employment was terminated, he also sued Baylor for defamation and added a claim for breach of contract, asserting that Baylor did not properly follow its termination procedures.

Several witnesses in Fox's jury trial testified that, while on a university-sponsored summer field trip in 1996 to an anthropological site in Guatemala, he—often while under the influence of alcohol—on numerous occasions initiated inappropriate and uninvited physical contact of a sexual nature with female students and also made crude sexual comments to them. One student on the trip, Shannon Mackay, reported the alleged incidents to the administration of Baylor where Fox, a tenured professor in the anthropology department, had been employed for twenty years. Baylor conducted an investigation and decided that the allegations against Fox were true. Before beginning termination proceedings, however, Baylor offered to continue Fox's employment if he would accept sanctions in the form of a demotion, a written apology, counseling, and dismissal of a defamation lawsuit he had filed against one of the complaining students. Fox refused. The matter was referred to the Faculty Tenure Committee ("Tenure Committee") which decided that the evidence warranted a termination hearing. Later, after a three-day hearing, the Tenure Committee recommended to Baylor's President that Fox's employment be terminated; the President concurred, and Fox was discharged.

Earlier, when Fox learned that Baylor was conducting an investigation, he sued one of the witnesses against him, Judy

Parker, for defamation on the basis that her statements to Baylor made during the investigation were untrue. After his termination, Fox joined Baylor as a defendant, alleging breach of his employment contract: he claimed that the investigation and hearing had not been conducted according to procedures contained in Baylor's personnel policies, which were part of his employment contract. He also alleged that Baylor had defamed him by its actions which led to information about the termination proceedings being disclosed to the public. In addition, he added an allegation that Parker defamed him by making false statements during the termination hearing. After a four-week trial, a jury returned its verdict, finding:

- Baylor failed to comply with its contract with Fox.
- Fox did not "waive" Baylor's obligations under the contract.
- Fox's damages were $153,788 for lost wages and employment benefits in the past and in the future.
- Baylor did not make defamatory statements about Fox.
- Parker did not make defamatory statements about Fox.

The court rendered judgment for Fox and against Baylor for contract damages in the amount of $153,788 plus $32,295.48 in prejudgment interest.

Fox appeals on twenty-one issues, complaining *inter alia* that the amount of damages the jury awarded was inadequate. In three cross-issues, Baylor asserts the evidence is legally insufficient to support the jury's finding that Baylor did not comply with the terms of the employment contract. Based on our analysis of Baylor's cross-issues, we will reverse the judgment and render a take-nothing judgment against Fox. Because of that, we do not reach many of his issues.

## I. BAYLOR'S LEGAL–SUFFICIENCY ISSUES

Fox alleged that Baylor breached the employment contract by failing to comply with procedures—all part of his employment contract—in three areas. He says: (1) procedures setting forth the mechanism for termination of a tenured professor were either not followed or inadequately followed; (2) procedures setting forth the method of investigating allegations of sexual harassment were not followed; and (3) procedures on employee confidentiality were not followed. The court submitted a single jury question without any instructions: "Did Baylor University fail to comply with its employment contract prior to terminating John Fox's employment with Baylor?"

Baylor's complaint rests on this reasoning:

- Fox's employment contract is unambiguous as to procedures which apply to terminations.
- Many of the procedures relied on by Fox are not ones to which Baylor was bound.
- The evidence shows that the procedures which do apply were thoroughly followed.
- Therefore, there is no evidence to support the jury's finding that Baylor did not comply with the employment contract.

### A. Standards of Review

#### Legal sufficiency of the evidence

When the party complaining of legal insufficiency did not have the burden of proof at trial, we conduct our review by considering only that evidence and the inferences therefrom which support the finding, considered in the light most favorable to the finding, and disregarding contrary

evidence and inferences. *Burroughs Wellcome Co. v. Crye,* 907 S.W.2d 497, 499 (Tex.1995); *Holt Atherton Industries, Inc. v. Heine,* 835 S.W.2d 80, 84 (Tex.1992). We can find the evidence legally insufficient if: (1) there is a complete absence of evidence for the finding, (2) there is evidence to support the finding, but rules of law or evidence bar the court from giving any weight to the evidence, (3) there is no more than a mere scintilla of evidence to support the finding, or (4) the evidence conclusively establishes the opposite of the finding. *Merrell Dow Pharms., Inc. v. Havner,* 953 S.W.2d 706, 711 (Tex.1997) (citing Robert W. Calvert, *"No Evidence" and "Insufficient Evidence" Points of Error,* 38 TEX. L.REV. 361, 362–63 (1960)); *Juliette Fowler Homes, Inc. v. Welch Assoc., Inc.,* 793 S.W.2d 660, 666 n. 9 (Tex. 1990). "More than a scintilla of evidence exists where the evidence supporting the finding, as a whole, 'rises to a level that would enable reasonable and fair-minded people to differ in their conclusions.'" *Burroughs Wellcome,* 907 S.W.2d at 499 (quoting *Transportation Ins. Co. v. Moriel,* 879 S.W.2d 10, 25 (Tex.1994)). If the evidence is so weak as to do no more than create a mere surmise or suspicion of the finding's existence, the effect is that there is legally-insufficient evidence. *Haynes & Boone v. Bowser Bouldin, Ltd.,* 896 S.W.2d 179, 182 (Tex.1995).

### Construing a contract

■■■ Whether a contract is ambiguous is a question of law for the court. *Heritage Resources, Inc. v. NationsBank,* 939 S.W.2d 118, 121 (Tex.1996). If a contract is not ambiguous, the rights and obligations under the agreement are also determined as a matter of law. *ACS Investors, Inc. v. McLaughlin,* 943 S.W.2d 426, 430 (Tex.1997). Therefore, we review these issues *de novo.*

■■■ An unambiguous contract is construed according to the plain meaning of its express wording. *Lyons v. Montgomery,* 701 S.W.2d 641, 643 (Tex.1985); *Kahn v. Seely,* 980 S.W.2d 794, 797 (Tex.App.-San Antonio 1998, pet. denied). But the court must "look[ ] at the contract as a whole in light of the circumstances present when the contract was entered." *Nat. Union Fire Ins. v. CBI Industries,* 907 S.W.2d 517, 520 (Tex.1995). Each part of the contract is considered against all other parts to determine its meaning, and there is a presumption that the parties intended every part to have some effect. *Heritage Resources,* 939 S.W.2d at 121. Terms used in the contract have their "plain, ordinary, and generally accepted meaning unless the [contract] shows that the parties used them in a technical or different sense." *Id.* Unambiguous contracts are enforced as written. *Id.*[1]

■■■ But if the express wording is subject to two or more reasonable interpretations, the contract is ambiguous. *CBI Industries,* 907 S.W.2d at 520; *Coker v. Coker,* 650 S.W.2d 391, 393 (Tex.1983). "Patent" ambiguities are those which are apparent from the face of the contract. *CBI Industries,* 907 S.W.2d at 520. "Latent" ambiguities arise when an apparently unambiguous contract is applied to its subject matter and an ambiguity appears. *Id.* If the court finds that a contract is ambiguous, either patently or latently, the goal then is to determine the true intentions of the parties, for that will resolve the ambiguity. *Id.; Coker,* 650 S.W.2d at 393; *Kahn,* 980 S.W.2d at 797. This determination involves fact issues. *Columbia Gas*

---

1. A trial court errs by submitting a question of the parties' intent to the jury when the contract, as a matter of law, is not ambiguous.

*John Wood Group USA, Inc. v. ICO, Inc.,* 26 S.W.3d 12, 16 (Tex.App.-Houston [1st Dist.] 2000, pet. denied).

*Trans. Corp. v. New Ulm Gas,* 940 S.W.2d 587, 589 (Tex.1996) (citing *Universal C.I.T. Credit Corp. v. Daniel,* 150 Tex. 513, 243 S.W.2d 154, 157 (1951)). Parol evidence may be introduced to discern the parties' intent. *CBI Industries,* 907 S.W.2d at 520. In a jury trial, the resolution of the parties' intent is assigned to the jury. *See Sage Street Associates v. Northdale Const. Co.,* 863 S.W.2d 438, 445 (Tex.1993); *John Wood Group USA, Inc. v. ICO, Inc.,* 26 S.W.3d 12, 16 (Tex.App.-Houston [1st Dist.] 2000, pet. denied).

### B. Termination Procedures

Most of the evidence at trial pertained to termination procedures. The parties vigorously contested which ones applied and whether those were followed.

#### Procedures asserted by Fox

Fox was granted tenure in 1983. At that time, and thereafter, there were written procedures for terminating a tenured professor. The parties agree that these were incorporated into Fox's employment contract. One of these is policy 704, which in 1983 stated that a tenured faculty member cannot be terminated "unless adequate cause for dismissal is demonstrated in a fair hearing, following established procedures of due process." Another policy applicable is 705 which sets out in considerable detail the procedures that must be followed before a tenured professor can be terminated. They include:

- A written "charge" containing allegations supporting dismissal is prepared by a designated administrator.
- The charge is filed with the Tenure Committee which sends a copy of it to the professor and requests an answer.
- The Tenure Committee reviews the charge and answer and decides whether there is "probable cause" to proceed to a dismissal hearing.
- The professor can challenge for cause the composition of the Tenure Committee, from which members of the professor's department are automatically excluded.
- At the hearing, "substantial evidence" to support termination must be submitted, and the professor may then challenge the evidence and present contradictory evidence. Witnesses are usually presented in person unless not reasonably available, in which event sworn statements may be submitted. Witnesses can be cross-examined.
- After the hearing, the Tenure Committee makes written findings and a recommendation, which are sent to the President of Baylor for a final decision. Absent serious procedural errors, the President accepts the Committee's findings. But the President has discretion about whether to follow a recommendation to terminate the professor.
- The Board of Regents of Baylor may review the President's decision.

With one exception (see "5" below), Fox admits that policies 704 and 705 "remained essentially unchanged from the time that Fox's tenure rights vested in 1984[sic] until June 1997, when ... [the President] ... unilaterally amended [705]" and issued additional guidelines for termination hearings. (RESPONSE BRIEF OF APPELLANT/CROSS APPELLEE p. 6). At trial, Fox alleged (1) inadequate application of procedures in policy 705, and (2) generally, a violation of policy 704's right to a "fair hearing, following established procedures of due process." [2] Specifically, Fox alleged:

---

**2.** Policy 704 was amended in November 1997, after Fox's termination, to delete "in a fair hearing."

1. Baylor failed to inform Fox early on that it was conducting an investigation.
2. Baylor failed to install an elected faculty committee to handle the matter instead of the Tenure Committee.
3. The charge filed with the Tenure Committee failed to explicitly state the grounds for dismissal in a way that referenced policy 705.
4. Baylor failed to obtain exculpatory evidence unavailable to Fox.
5. Baylor's President forced on Fox's Tenure Committee new guidelines for conducting the hearing which were prejudicial to Fox.[3]
6. The findings and recommendation from the Tenure Committee were prepared by Baylor's attorney, which prevented the Tenure Committee from "presenting a reasoned report."
7. Baylor provided material benefits—legal counsel—to student witnesses it called at the hearing.
8. In its decision to proceed to a hearing, Baylor required the Tenure Committee to accept as true the hearsay allegations of a single witness.
9. One of Baylor's attorneys presided at the hearing, skewing the evidentiary rulings in Baylor's favor.
10. The President never reviewed a transcript of the hearing.
11. Baylor did not provide the Board of Regents with a transcript of the hearing.

In addition to violations of policies 704 and 705, Fox alleged that Baylor had violated forty-year-old termination procedures of the American Association of University Professors ("AAUP"). Specifically, Fox alleged that violations 1, 2, 3, and 6 above were also violations of the AAUP procedures. Fox argued that, in 1940, the AAUP and the Association of American Colleges adopted a "Statement of Principles on Academic Freedom and Tenure" (the 1940 statement). In 1958, the organizations adopted a "Statement of Procedural Standards in Faculty Dismissal Proceedings" (the 1958 statement). Fox asserts that because Baylor's policy 701—a policy pertaining to "Academic Freedom"—quotes from part of the 1940 statement dealing with academic freedom, Baylor thereby adopted the 1958 statement and its procedures.

In summary, we must decide: (1) Was the contract ambiguous?; (2) If not, what procedures was Baylor contractually obligated to follow?; and (3) Was the evidence legally sufficient to prove that Baylor failed to comply with any of those procedures?

### Applicable procedures

The court refused Baylor's request to find that the contract is unambiguous as a matter of law and to instruct the jury that policy 705 was the controlling agreement regarding termination procedures. Baylor argues that if the contract is unambiguous and only the procedures in 705 are applied, then all of Fox's evidence about how the contract should be interpreted and about other procedures is not probative. It further points to Fox's expert's testimony that Baylor complied with the procedures in 705 and to other evidence about what procedures were followed, and to what extent. On that basis, Baylor says we should find that the evidence is legally insufficient

---

**3.** This was authorized by an amendment to policy 705 in June 1997, shortly before Fox's hearing, stating that the "President may issue additional procedural guidelines not inconsistent with this policy."

to support the jury's finding of non-compliance with the contract.

█ It is undisputed that Fox's employment was extended annually. In April 1996, Baylor's President sent Fox a letter for the upcoming 1996–97 school year. The letter did not refer to the summer term. It stated, in part, "If you accept this letter of appointment, your complete contract with Baylor consists of this letter of appointment and the applicable provisions of the Baylor University Personnel Policy Manual, which Baylor may change from time to time." Fox signed the signatory line at the bottom of the letter which referred to the following statement: "I accept this appointment, am ready, willing and able to perform my duties, and agree to abide by the terms of this letter of appointment." Similar letters had been sent each year extending Fox's contract. Accordingly, we find no ambiguity in the April 1996 letter that the applicable procedures are to be found in Baylor's Personnel Policy Manual. *Heritage Resources,* 939 S.W.2d at 121; *Lyons,* 701 S.W.2d at 643.

█ As for Fox's argument about the 1958 statement, we find no support, either in the express language of policy 701, in the evidence, under any applicable legal principle, or logically, that by quoting in 701 from the 1940 statement on academic freedom, Baylor intended to incorporate the 1958 statement or its procedures for termination into Baylor's policies. In addition, Fox's own expert testified that Baylor had not adopted the 1958 procedures for termination. Furthermore, Fox's arguments that, based on "custom in the industry" and "trade-usage," the 1958 statement must have been incorporated are unavailing, because those aids to contract construction are not used unless a contract is ambiguous. *Transcontinental Gas Pipeline v. Texaco,*

35 S.W.3d 658, 670 (Tex.App.-Houston [1st Dist.] 2000, no pet.); *Printing Ctr. of Texas, Inc. v. Supermind Pub. Co., Inc.,* 669 S.W.2d 779, 784 (Tex.App.-Houston [14th Dist.] 1984, no writ). Thus, construing the contract as a matter of law, we find that the 1958 statement and its procedures were not a part of Fox's contract. *Heritage Resources,* 939 S.W.2d at 121; *Lyons,* 701 S.W.2d at 643. Therefore, those procedures for termination provide no basis to support the jury's finding that Baylor failed to comply with the employment contract. *Merrell Dow Pharms.,* 953 S.W.2d at 711.

The Pennsylvania Supreme Court has similarly construed the application of the 1958 statement. For example, in *Murphy v. Duquesne University,* the Court rejected a contention almost identical to Fox's. *Murphy v. Duquesne University,* 565 Pa. 571, 777 A.2d 418 (2001). A tenured professor was accused by a student of sexual harassment, and the university conducted an investigation. *Id.* 565 Pa. at 578, 777 A.2d at 422. The professor argued that the 1958 statement was not followed. *Id.* 565 Pa. at 599, 777 A.2d at 434. The Court said that, in the documents comprising the employment contract, the university never "explicitly mentioned or referred to or incorporated by reference the 1958 AAUP Statement," and therefore it was not part of the employment contract. *Id.* 565 Pa. at 600, 777 A.2d at 435.

█ Finally, we address Fox's argument that additional procedures apply which derive from policy 704. Policy 704 requires that tenured faculty cannot be terminated "unless adequate cause for dismissal is demonstrated in a fair hearing, following established procedures of due process." Fox argues that the terms "fair hearing" and "due process" somehow enlarge on the procedures in policy 705.

Through this enlargement process, Fox asserts, Baylor was obligated to follow a host of unwritten procedures, *i.e.*, the eleven items listed in "Termination Procedures Asserted" above. But we find that policy 704 is a general provision whose intent is put into action by the specific procedures in policy 705; and in contract construction, specific provisions control over general provisions. *Forbau v. Aetna Life Ins. Co.*, 876 S.W.2d 132, 133–34 (Tex.1994); *Silver Spur v. Clarksville Seniors*, 848 S.W.2d 772, 775 (Tex.App.-Texarkana 1993, writ denied); *Mid Plains Reeves v. Farmland Industries*, 768 S.W.2d 318, 321 (Tex.App.-El Paso 1989, writ denied). Therefore, policy 704 does not enlarge Baylor's obligations beyond the express procedures in policy 705. Thus, unenunciated procedures allegedly arising from policy 704 are not part of the contract, and they provide no basis to support the jury's finding that Baylor failed to comply with the employment contract. *Merrell Dow Pharms.*, 953 S.W.2d at 711.

Therefore, we turn to a discussion of the evidence pertaining to the express procedures in policy 705.

### Policy 705

■ The evidence conclusively shows that Baylor carefully followed the procedural steps in policy 705. After an investigation, an appropriate university official filed a charge with the Tenure Committee. Fox was duly notified, and he filed an answer, which the Tenure Committee reviewed, then found "probable cause" to proceed. A hearing was held in late August 1997 before a properly comprised panel. Fox was represented by counsel at the hearing, which lasted three days. Fox's counsel made opening and closing statements, objected to evidence, cross-examined the witnesses, and presented evidence. The Committee made thirty-three findings of incidents which supported a "for cause" termination in satisfaction of policy 705. The President of Baylor accepted the Tenure Committee's recommendation and sent a letter of termination to Fox, who did not at that time raise objections to the procedures that had been used. At trial, Fox's expert witness on tenured-faculty terminations testified that Baylor had followed the procedures in policy 705. We have searched the record diligently for evidence or inferences that Baylor did not scrupulously follow the procedures the parties contracted for in policy 705, and we find a complete absence of such evidence. Therefore, the evidence is legally insufficient to support the jury's finding that Baylor failed to comply with Fox's employment contract. *Merrell Dow Pharms.*, 953 S.W.2d at 711.

### The 1983 tenure letter

■ Fox makes one additional argument in his response brief which we must address. He complains that Baylor's President had no right to institute guidelines for termination hearings shortly before Fox's hearing. However, Fox's April 1996 annual letter of employment, which he signed and agreed to in April 1996, specifically says that his "complete contract with Baylor consists of this letter of appointment and the applicable provisions of the Baylor University Personnel Policy Manual, *which Baylor may change from time to time.*" (Emphasis added). There is no ambiguity that the letter allowed for the amendment of policy 705, which thereby allowed the President to institute guidelines. *Heritage Resources*, 939 S.W.2d at 121.

■ Fox, however, argues that this letter does not cover the summer of 1996.[4]

---

**4.** The April 1996 letter covered the next school year beginning in September 1996.

(There are no separate letters for summer employment in the record.) He says in his response brief that his contract for the summer of 1996 was governed by a letter in 1983 which granted him tenure, not by the April 1996 letter, and under the 1983 letter, the President was not authorized to institute procedural guidelines. Therefore, when new guidelines were instituted before his termination hearing in the summer of 1997, his rights that were established in 1983 were violated.

Fox's argument is unavailing. He did not plead the 1983 letter as his contract, and he testified several times that the 1996 letter, which he introduced as an exhibit early in the trial, was his contract. Also, each yearly letter reciting that Fox's employment was extended contains his salary for that year, and we assume he would not contend that the salary in the 1983 letter was the one Baylor was obligated to pay in 1996–97. The logical conclusion is that each letter modified the previous one. *E.g., Cadle Co. v. Henderson,* 982 S.W.2d 543, 546 (Tex.App.-San Antonio 1998, no pet.) (parties to a contract may modify it); *Mid Plains Reeves,* 768 S.W.2d at 321; *Mandril v. Kasishke,* 620 S.W.2d 238, 244 (Tex.Civ.App.-Amarillo 1981, writ ref'd n.r.e.). In fact, the 1983 letter implies future modifications because it says: "Summer session salaries are based on the salaries for the preceding regular academic year." The use of the plural "salaries" implies that Fox's salary in the summer of 1996 was based on his salary for the 1995–1996 school year as set forth in his employment letter for that year, not as

set forth in the 1983 letter. Furthermore, the 1983 letter, construed according to the plain meaning of its express wording, granted Fox tenure and states that Baylor will follow its procedures when dealing with him. *Lyons,* 701 S.W.2d at 643. It does not guarantee that those procedures will never change. Finally, a letter extending employment was sent each year, and for some time those letters contained the provision allowing Baylor to amend the policy manual. Fox signed each letter agreeing to its terms. By signing each extension letter, Fox agreed to whatever modification of his contract (and Baylor's procedures) the letter might put into effect.[5]

For these reasons, Fox's reliance on the 1983 letter fails, and we reject the argument as being without evidentiary support.

## C. Sexual Harassment Investigation Procedures

■ The second area in which Fox asserted procedural violations was an alleged obligation by Baylor to have the complaining students use the school's Sexual Harassment Mediation Board or Civil Rights Policy, which were alternative avenues for making a sexual harassment claim.[6] The Board and its related procedures were instituted but not officially replaced by the Civil Rights Policy in 1995 or 1996, and the replacement was made official on June 24, 1997, the day after Fox sued Baylor. Fox says he was entitled to have Baylor use the alternative avenues to investigate and process the complaints against him. We note that the alternative

---

The 1995 letter which covered the 1995–1996 school year was not introduced at trial. The parties do not contest which letter covered the summer of 1996, so we do not address that matter.

5. We also note that the hearing was held in the summer of 1997 following the time period

covered by the 1996 letter. Therefore, the 1996 letter was the nearest in time to the hearing.

6. Fox devotes one paragraph to this argument in his response brief.

avenues do not preclude the termination process from being implemented simultaneously. But more importantly, as Baylor points out, the purpose of these alternatives is to benefit students (and employees) who may have been victims of sexual harassment; they are not for the benefit of an accused. Furthermore, the evidence shows that Baylor did apprise the students that they could pursue their complaints individually, but the students declined to do so. Thus, we find the evidence conclusively establishes that Baylor did not violate sexual harassment procedures, because (a) he had no entitlement and (b) Baylor adequately implemented the procedures. Therefore, we find no evidence on this basis for the jury's finding of non-compliance. *Merrell Dow Pharms.*, 953 S.W.2d at 711.

### D. Confidentiality Procedures

■ Finally, the third area in which Fox asserted procedural violations concerns Fox's assertion that Baylor breached an obligation to not disclose information in Fox's personnel file.[7] He argues that when Baylor informed the student witnesses of the pending investigation and termination proceeding against Fox, it violated that obligation. News of the matter also was reported in the student and city newspapers. Again, as Baylor points out, (1) the fact of the existence of the investigation and proceeding was not strictly or solely in the personnel file, (2) Baylor had no other way of gaining the participation of the witnesses except through revealing to them what was occurring, and (3) the confidentiality policy explicitly provides that Baylor may disclose information in a personnel file to protect its interests in an employment dispute. Furthermore, as Fox admits in his brief, "[t]here was little to no evidence of this breach presented at

trial...." (RESPONSE BRIEF OF APPELLANT/CROSS APPELLEE p. 56). We conclude that there is no evidence to support this allegation, and therefore the evidence is legally insufficient on this basis to support the jury's finding of non-compliance. *Merrell Dow Pharms.*, 953 S.W.2d at 711.

### E. Summary

Many of the procedures Fox claims Baylor was obligated to follow were not, as a matter of law, part of the contract with Baylor. Of the procedures which Baylor agreed to, either there is no evidence that Baylor did not follow them, or the evidence conclusively established that Baylor followed them. We find the evidence legally insufficient to support the jury's finding that Baylor did not comply with the employment contract. Thus, unless one or more of Fox's issues require reversal, we will render judgment for Baylor.

### II. FOX'S ISSUES

Fox's first issue is that the court erred in admitting evidence about settlement offers from Baylor to Fox which he rejected, which evidence supported Baylor's argument that he failed to mitigate damages. However, because we have determined that Fox will take nothing on his breach-of-contract claim against Baylor, this issue regarding damages is moot and we do not reach it. For the same reason we do not reach his second through fifth issues complaining that the court erred in not granting his motions for judgment notwithstanding the verdict regarding the amount of damages, and that the amount of damages the jury awarded was against the great weight and preponderance of the evidence. We turn now to those issues which might require a new trial or another remedy.

---

**7.** Fox devotes one sentence to this argument in his response brief.

## A. Issues on the Parker Defamation Claim

In a single question, the charge combined inquiries about defamatory statements and proximate cause: "Did Judy Parker make defamatory statements about John Fox that proximately caused injury to John Fox?" Fox objected at trial to the inclusion of the "proximate cause" inquiry. In issues six and seven Fox argues that (a) the court erred in not ruling that Parker's oral and written statements to Baylor were defamatory *per se*, thus making the "proximate cause" inquiry unnecessary, and (b) the jury's finding on the Parker defamation issue is against the great weight and preponderance of the evidence.

### Defamation per se

 In a defamation case, assuming there is no dispute that certain statements were made, the court should determine whether, as a matter of law, the complained-of statements are defamatory. *Carr v. Brasher*, 776 S.W.2d 567, 570 (Tex. 1989); *Kelly v. Diocese of Corpus Christi*, 832 S.W.2d 88, 91 (Tex.App.-Corpus Christi 1992, writ dism'd w.o.j.). If the court finds the defamatory nature of the words ambiguous, the jury should decide the issue. *Id.* But statements which accuse of sexual harassment, as here, are defamatory *per se, i.e.,* their defamatory nature need not be demonstrated. *E.g., Gray v. HEB Food Store # 4*, 941 S.W.2d 327, 329 (Tex.App.-Corpus Christi 1997, writ denied). In a defamation *per se,* the law presumes that a person's reputation has been injured thereby. *Leyendecker & Associates, Inc. v. Wechter*, 683 S.W.2d 369, 374 (Tex.1984). And he may recover "general" damages, such as for mental anguish, without proof of injury. *Id.* Thus under normal circumstances in a case of defamation *per se,* there need be no inquiry in the charge about whether there was a defamation or about "proximate cause" and injury (or the jury may be instructed to so find).

Fox, however, did not object to the inclusion of a question about whether a defamation occurred; his objection was limited to the inclusion of an inquiry about "proximate cause." The resolution of this issue turns on the wording of the defamation damages question to which Fox did not object. The question asked: "What sum of money ... would fairly and reasonably compensate John Fox for his damages, if any, proximately caused by such defamation? Consider the following elements of damages .... Compensatory damages for pecuniary losses, excluding wages and employment benefits, including damage to reputation, emotional pain, suffering, mental anguish, loss of enjoyment of life in the past and/or in the future." The problem for Fox lies in the fact that the question includes "special" damages.

 "Actual" damages are divided into "general" ("direct") and "special" ("consequential") damages. *Arthur Andersen & Co. v. Perry Equip. Corp.*, 945 S.W.2d 812, 816 (Tex.1997); *Henry S. Miller Co. v. Bynum*, 836 S.W.2d 160, 163 (Tex.1992) (Phillips, C. J., concurring); *O'Connor's Texas Causes of Action* (2001–02), p. 755–56. "General" damages are those conclusively presumed as a matter of law to have been foreseen by the defendant as a necessary and usual result of the defendant's wrongful act. *Arthur Andersen*, 945 S.W.2d at 816. They do not have to be pled. *Green v. Allied Interests, Inc.*, 963 S.W.2d 205, 208 (Tex.App.-Austin 1998, pet. denied). All other damages are "special" damages which must be foreseeable to the defendant but are not the necessary and usual result of the wrong. *Arthur Andersen*, 945 S.W.2d at 816. They must be specially pled. TEX.R. CIV. P. 56; *Harkins v. Crews*, 907 S.W.2d 51, 61 (Tex. App.-San Antonio 1995, writ denied).

Thus the question combined "general" and "special" damages. Cagle, Cherry & Kemp, *The Classification of General & Special Damages for Pleading Purposes in Texas,* 51 Baylor L.Rev. 629 (1999) (*e.g.,* future damages are "special" damages). Fox cannot have the benefit of "special" damages while at the same time rejecting a "proximate cause" inquiry which is required for "special" damages. Under these circumstances, the court was correct to include "proximate cause" in the defamation question.

Alternatively, Fox did not object to the damages question which asked, conditioned on an affirmative finding on the defamation question: "What sum of money . . . would fairly and reasonably compensate John Fox for his damages, if any, proximately caused by such defamation?" Thus the jury was asked to make a finding about "proximate cause" apart from the part of the defamation question which inquired about it. By failing to object, Fox's objection about "proximate cause" in the defamation question becomes moot. *Cf.* TEX.R.APP. P. 33.1(a).

We overrule this issue.

### Sufficiency of the evidence

■ Fox argues that the negative finding on the Parker defamation question was against the great weight and preponderance of the evidence. This is a factual-sufficiency complaint. When a party who had the burden of proof complains of the factual insufficiency of an adverse finding, it must demonstrate that the adverse finding is contrary to the great weight and preponderance of the evidence. *Dow Chemical Co. v. Francis,* 46 S.W.3d 237, 242 (Tex.2001); *Cropper v. Caterpillar Tractor Co.,* 754 S.W.2d 646, 651–53 (Tex. 1988).

In the defamation question, the term "defamatory statement" was defined as a "statement that tends to injure a person's reputation and, as a result, exposes a person to public hatred, contempt or ridicule, or financial injury." But because of the form of the question, we cannot determine whether the jury found that Parker did not make any defamatory statements—which would appear to be unsupportable under the definition of "defamatory statement" and the evidence—versus that it found she did make defamatory statements but they did not proximately cause injury to Fox. This is always a potential problem under the broad-form submission rules under which trial courts must operate. TEX.R. CIV. P. 277. But even if we assume that Parker made "defamatory statements" as defined in the charge, Fox has not "demonstrate[d] that the adverse finding [about proximate cause] is contrary to the great weight and preponderance of the evidence." *Dow Chemical Co.,* 46 S.W.3d at 242.

The primary complaint Fox made at trial was about the alleged breach of contract. Indeed most of his evidence on damages concerned his lost wages and earning capacity related to the contract claim, which were specifically excluded in the damages question on the defamation claim, which said "excluding wages and employment benefits" while including "[c]ompensatory damages for pecuniary losses . . . including damage to reputation, emotional pain, suffering, mental anguish, loss of enjoyment of life in the past and/or in the future." Because Fox's emphasis was on the breach-of-contract claim, the jury could reasonably have found that most of his injuries derived from that claim. In addition, other students made statements to Baylor about Fox's behavior equally as damaging as Parker's, although less in scope. The jury need not have attributed any injuries from defamatory comments solely to Parker. In summary, Fox has not demonstrated evidence of such

728

magnitude to fulfill his burden to show that Parker's statements must have caused him injury. We overrule this issue.

## B. Discovery Issues

In issue eight, Fox argues that the court erred in denying his request to take a second deposition of Parker concerning the diary of Shannon Mackay, which Fox alleges Parker failed to timely produce. This failure also necessitated a costly second deposition of Mackay, and Fox asserts in issue nine that the court should have imposed monetary sanctions against Baylor and Parker for failing to produce the Mackay diary.

Fox presents the complaint about the requested deposition "[i]n anticipation of a new trial." (BRIEF OF APPELLANT p. 42). Because we will reverse and render in favor of Baylor, we do not reach this issue.

Regarding the sanctions issue, a trial court has inherent power, subject to an abuse of discretion standard, to impose sanctions not covered by rule or statute to discipline an attorney's behavior. *E.g., In re Bennett,* 960 S.W.2d 35, 40 (Tex.1997). There was discrepant evidence about whether Baylor had the diary; therefore the court did not abuse its discretion in refusing to sanction Baylor. As for Parker, the evidence shows that the primary obstacle which caused Fox so much delay and expense were the actions taken by Mackay's lawyer in California (where the deposition was to occur) in seeking to quash the deposition. We do not attribute that to Parker. Again, we do not find that the court abused its discretion. Accordingly, we overrule this issue.

## C. Remaining Issues

Issue 10 pertains to requested jury charge instructions which were denied. Issues 11 through 19 pertain to pretrial rulings; these issues are presented "conditionally" in the event we grant a new trial on Fox's breach of contract action. Issues 20 and 21 pertain to Baylor's motion for summary judgment, granted by the court, concerning a claim by Fox of retaliation against him for expressing opposition to what he considered discriminatory practices against employees on the basis of religious belief.

Issues 10, 20, and 21 are not briefed at all, and the remaining issues are not adequately briefed. Our rules require that "[t]he brief must contain a clear and concise argument for the contentions made, with appropriate citations to authority and to the record." TEX.R.APP. P. 38.1(h), 38.2(a)(1). This is especially important in a case such as this with a reporter's record consisting of many thousands of pages covering a four-week trial. By his failure, Fox has waived review of these issues. *E.g., Franklin v. Enserch, Inc.,* 961 S.W.2d 704, 711 (Tex.App.-Amarillo 1998, no pet.); *Sisters of Charity of the Incarnate Word v. Gobert,* 992 S.W.2d 25, 31 (Tex.App.-Houston [1st Dist.] 1997, no pet.); *Leyva v. Leyva,* 960 S.W.2d 732, 734 (Tex.App.-El Paso 1997, no writ).

## III. CONCLUSION

Having found the evidence legally insufficient to support the jury's finding that Baylor did not comply with the employment contract, and finding Fox's issues without merit, we reverse that part of the judgment against Baylor and render a take-nothing judgment against Fox, and we affirm the remainder of the judgment.

CUMMINGS, J., sitting by assignment.