John Cathey v. Larry Meyer and John Glover
















IN THE
TENTH COURT OF APPEALS
 

No. 10-99-326-CV

     JOHN CATHEY,
                                                                              Appellant
     v.

     LARRY MEYER AND JOHN GLOVER,
                                                                              Appellees
 

From the 74th District Court
McLennan County, Texas
Trial Court # 97-1786-3
                                                                                                                

DISSENTING OPINION
                                                                                                                      Where to begin? 
THE APOLOGY
      First, I guess, with an apology. My apology to the litigants.
      Much of the delay in the disposition of this appeal has been caused by me, either indirectly
or directly. Indirectly because the Legislature by statute and the Supreme Court by rule have
prioritized other cases as more important or more deserving of a quicker resolution than a civil
case involving a money judgment.
      Highest in the priorities are those cases given special priority or precedence by law, for
example, adjudications of juvenile delinquency and termination of the parent-child relationship. 
Tex. R. App. P. 40.1(a); see Tex. Fam. Code Ann. §§ 56.01(h), 109.02(a) (Vernon 2002). Next
are accelerated appeals, including the ever-expanding list of interlocutory appeals. Tex. R. App.
P. 40.1(b); id. 28; see Tex. Civ. Prac. & Rem. Code Ann. § 51.014(a) (Vernon Supp. 2003),
amended by Act of June 2, 2003, 78th Leg., R.S., H.B. 4, § 1.03 (effective Sept. 1, 2003). Next
are cases to which the Court gives precedence “in the interest of justice,” and it is my
understanding that such cases include those involving family relationships, particularly those
concerning children. See Tex. R. App. P. 40.1(c). Then there are the numerous criminal cases. 
Id. 40.2. And on the bottom of the Legislature’s and Supreme Court’s lists are cases like this one,
a general civil case involving a money judgment. I have honored those priorities.
      Overlay all of these with original proceedings, such as petitions for writs of habeas corpus and
mandamus, which this Court has, in the past, endeavored to deal with “expeditiously.” See 10th
Tex. App. (Waco) Loc. R. 17(c). And heaped upon all these cases like onions on smothered liver
are the motions, both routine and exceptional, that must be resolved. 
      And while we endeavor to stay focused on the disposition of cases, there are the constant
distractions of dealing with administrative issues: budgets, personnel, supplies, equipment, file
storage, facilities, and the thousand other little things judges are required to deal with.
      One last thing. We are elected public officials. As such, we have mandatory reporting and
filing requirements. Also there is an ever-present recognition that we are responsible to the people
in our district to communicate what our responsibilities are, what decisions we have made, and
how those decisions affect them. And yes, as elected judges, we must also campaign for re-election. Re-election is particularly important if you believe that stability and predictability in the
law is important. I do.
      But all of these work-related demands on my time have only been the indirect reasons for my
delay of this opinion.
      Part of the direct delay was pure hubris, pride. I did not want to admit that I was confused. 
I simply could not, and do not, understand the manner in which the majority reached the result that
it has. I thought: How can it be that the draft opinion makes no sense to me? So I commented
upon it and sought clarification. I did not receive it.
      So, I thought, it is my own ignorance that keeps me from understanding what the majority has
written. To overcome my ignorance, I began to read. I began by again reading the briefs and the
majority opinion. I continued by reading the voluminous record—six file boxes of trial-court
transcripts and exhibits sit in my office—and an untold number of cases relevant to the issues
raised in this appeal.
      All during this time, I was thinking—thinking about the interrelationship of the contents of
the record, the issues, the law, and the result reached by the majority. I was thinking about it
while I was driving, while I was mowing, and even while I sat in church.
      Virtually everywhere I went, this case went with me. It burdened me. But as a result of my
deliberations and research I began to organize my thoughts. Occasionally, I would have an
epiphany, a flash of clarity of understanding. Issues clouded by legalese and thousands of pages
of written text would suddenly break through the words and become understandable, almost
tangible. The clarity would come as forceful and solid as the hammer of a skilled blacksmith
striking white-hot steel poised on the smith’s anvil.
      But again hubris delayed me.
      Armed with this enlightenment I was sure that I could enlighten my colleagues. I thought that
I could show them the light that I had seen. It was not to be.
      All is not lost. In the end, I learned patience. I was not able to convince them of what I
believe to be the errors of their analysis. But I learned that you cannot rush the benefits to be
obtained by careful research, time spent in careful deliberation, and being candid about why it has
taken so long for the parties to get an answer to the issues presented in their case. Therefore, for
my part in delaying this already slow and painstaking process—and my part has been a substantial
cause of the lengthy time this case has been on appeal—I do apologize to the parties.
THE TASK: A PLAN
      The task that now lies before me is to try to communicate why I believe the majority opinion
is wrong. I will note some portions of the opinion with which I agree, but in the final analysis I
must, respectfully, note my disagreement with the opinion and the result it reaches.
      This dissenting opinion will briefly describe the procedural background of this case. 
Specifically I will give a brief overview of how it got where it is—the trial, the charge, and the
appeal. Discussion in greater detail of each will be reserved for discussion with the issues when
necessary. I will then discuss only the most fundamental of the errors that are contained within
the majority opinion. Also, I will briefly discuss the errors made by omissions from the majority
opinion. Finally, in conclusion, I will endeavor to explain what I believe is the proper result after
all the necessary issues are resolved.
Procedural Background
The Trial
      The trial was about a business arrangement that went bad. Unfortunately the precise terms
of the arrangement were not reduced to writing at the time it was entered into. It is not necessary
for us to define or label the nature of this arrangement. While it would have been preferable for
the litigants to have reduced their agreement to writing, they did not.
      The general nature of the arrangement was an agreement—a contract. As indicated, the
contract was not in writing. It is no surprise that, by the time of trial, the parties to the contract
could not agree on what the terms had been at the beginning of their relationship, or how the terms
might have been modified over time for unforeseen events and changed circumstances.
      The trial was about what were the terms of the arrangement—this contract. In particular, the
trial was about whether Cathey was entitled to damages because of the events surrounding only
eight of the numerous ventures on which Cathey performed some services for the assistance of
Meyer.
      Meyer was the money man. 
      Cathey performed certain business-related services for Meyer. The services could generally
be characterized as either of two types: as business manager or as developer.
      As business manager, Cathey oversaw the management of a number of properties owned by
Meyer or a Meyer-owned company. For some of the properties, I believe a fair characterization
of the record would be that the ownership of the property/company/venture was not fully known
to Cathey. For these services, Cathey was paid a more-or-less fixed amount—a salary. But there
was some testimony that questioned whether these payments were salary or whether they were
merely intended to be draws against future earnings from the developer side of the arrangement.
      As a developer, Cathey was to seek out investment opportunities for Meyer. And this is
where the terms of the arrangement become very murky. The extent to which there was
agreement at trial on this aspect of the arrangement is that for the developer services Cathey would
be paid something. Because most of the ventures involved the purchase or creation of a legal
entity—corporation, partnership, limited liability partnership, and so forth—it was not clear who
would pay Cathey, the new entity or Meyer, or on what basis payments to Cathey would be
calculated.
      Amongst all the evidence admitted at trial that the jury, the trial court, and now this Court, 
sifted, the essence of the trial was the question: What was the arrangement between Cathey and
Meyer regarding payment for these developer services? In a broad sense, this was what went to
the jury for a decision.
The Charge
      In the charge, the jury was asked about eight specific ventures. The essence of the jury’s
answers was that Meyer had, through fraud, induced Cathey to enter into a written contract for
four of the ventures, and to perform services on four other ventures for which Cathey was not
otherwise compensated, that is, for which he was not compensated by his business-manager salary.
      The jury answered in favor of Cathey as to all eight ventures and determined damages as to
each.
      The jury was also asked whether the evidence of harm from fraud was clear and convincing
for two of the ventures. Again the jury answered in favor of Cathey. And in answer to another
question, the jury determined an amount of punitive damages.
      The jury also determined that Meyer had breached a fiduciary duty that he owed to Cathey. 
The jury determined damages as a result of the breach for two of the ventures.
      But the jury’s work was not finished. Meyer had defenses. Meyer contended that if he had
induced Cathey by fraud, which of course he denied, Cathey had ratified or waived the fraud. 
Thus, Cathey would not be entitled to recover the fraud damages, actual or punitive, as determined
by the jury. The jury found ratification and waiver as to all eight ventures. Arguably the jury also
answered limitations questions in favor of Meyer.
      After a rather extensive post-verdict motion practice, the trial court rendered judgment that
Cathey take nothing from Meyer and sanctioned Cathey for discovery abuse. Cathey appealed.
The Appeal
      Because the basis of the trial court’s judgment is not clear, Cathey attacked all the grounds
that would support it.
The Majority Opinion
(The Problems with What is in it and What is not)

      After my apology and the overview of the procedural background, it is now time to turn to
the majority’s opinion. Again I am faced with the question—Where to begin?
      There are many sections, parts, portions, and statements in the majority opinion with which
I do not agree. Rather than comment upon, attack, or respond to each, I will focus on the
analytical issues that result in errors that, for the most part, even the most discerning reader would
be unable to identify. These are issues that arise because of a flawed analysis of the record—a
record not available to the reader. But it should not be inferred that I agree with anything in the
majority opinion because I do not comment upon it in this dissenting opinion. It would simply
serve no useful purpose for me to spend the time or the effort to address each and every
disagreement.
No Evidence of Fraud Damages?
      The jury determined Cathey’s damages on each of eight ventures. The charge defined the
eight specific ventures. Two were referred to as projects: City Lights Project and Plaza at Turtle
Creek Project. Four were referred to as contracts: Silverado Apartments Contract, Polo Club
Apartments Contract, Valley Ranch Contract, and Arbors Apartments Contract. Two were
referred to in relation to refinancing: Silverado Refinancing and Arbors Refinancing.
      I will begin with the majority’s flawed analysis of damages for fraud on the two projects. The
liability question and jury’s answer was as follows:
Was Cathey induced through fraud by Meyer to provide valuable services to Meyer
for which he was not otherwise compensated with respect to either of the following listed
below?
 
Fraud occurs when—
a.a party makes a material misrepresentation,
b.the misrepresentation is made with knowledge of its falsity or made recklessly
without any knowledge of the truth and as a positive assertion,
c.the misrepresentation is made with the intention it should be acted on by the
other party, and
d.the other party acts in reliance on the misrepresentation and thereby suffers
injury.
“Misrepresentation” means—
a.a false statement of fact; or
b.a promise of future performance made with an intent not to perform as
promised.

Answer “Yes” or “No” as to each project listed below:
            5a. City Lights Project                       Yes 
5b.Plaza at Turtle Creek Project Yes 

There was no condition upon which this question could be skipped by the jury. The damages
question and jury answer was as follows:
If your answer to Questions Number 5a or 5b is “Yes,” then answer the following
Question. Otherwise, do not answer the following Question.

QUESTION NUMBER 6:

What sum of money, if any, if paid now in cash, would fairly and reasonably
compensate Cathey for his damages, if any, that were proximately caused by such fraud?

Consider the following elements of damages, if any, and none other: the difference
between the value as represented and the value received.

Answer separately in dollars and cents, if any, for each of the following, if
any, to which you answered “Yes” in response to Question No. 5.

6a.City Light [sic] Project$ 150,000.00 
6b.Plaza at Turtle Creek Project$ 750,000.00 

      The majority concludes there is some evidence to support the jury’s answer to the damages
question regarding the City Lights Project but no evidence to support the jury’s answer to the
Plaza at Turtle Creek Project.
      To understand why the majority’s analysis is flawed, the focus must be on the actual wording
of the question and, in particular, the related instruction. The instruction gives only one element
of damages: “the difference between the value as represented and the value received.”
      The calculation is deceptively simple: determine the value as represented, deduct from that
the value actually received, and voilà—the amount of damages. As a reviewing court looking for
legally sufficient evidence, all we have to find is some evidence of each part of the calculation.
      The easy part of the calculation is the deduction. No one contends that Cathey received
anything for either of these projects. So my focus is on the first amount needed to make the
calculation—the value as represented. And for my purpose, which is to illuminate the flaws in the
majority’s analysis, I will focus on determining the fundamental difference, or lack thereof,
between the evidence of the “value represented” for the City Lights Project versus the Plaza at
Turtle Creek Project. Specifically, what is the difference in the evidence that makes it some
evidence as to the City Lights Project, but no evidence on the Plaza at Turtle Creek Project, as
determined by the majority?
      The evaluation and decision to proceed with both projects involved the use of projected cost
and revenues, in the form of pro-forma financial projections, and using those projections to obtain
loans to fund the projects. The preparation, including the participation of both Meyer and Cathey,
and the use of the pro-forma financial projections, was explained to the jury. Those pro-forma
projections were prepared by Cathey. The projections were prepared based on information
provided by both and presented in a format that he and Meyer used on the ventures. Thus the two
of them were familiar with what information was included in the projections, and with the manner
in which the projections were compiled and presented.
      As new, additional, or more current information was received by Cathey, he would update
the projections. A series of pro-forma financial projections for each project was introduced into
evidence. (Plaintiff’s Ex. Nos. 189 (City Lights Project), 195 (Plaza at Turtle Creek Project)). 
In addition to this evidence, other evidence of the value of these projects at various times and
under other circumstances was admitted.
      Again, the jury was asked to determine damages proximately caused by Meyer’s fraud as
measured by the difference in value as represented and the value received. The value received
being zero, is there some evidence of “value as represented”?
      To answer this question, the jury had to decide, without any direction from the court, if there
had been any representation of value, and if so, what was the value represented. And subsumed
within the jury’s consideration was whether it mattered when the representation was made or by
whom the representation was made. Because the question and instructions gave the jury no
guidance on who had to make the representation or the time frame of the representation of value,
the jury’s only limitation was the damages proximately caused by the fraudulent representation.
      So now we come to the issue we must decide: is there some evidence of damages in this
record that will support the jury’s implied determination that Cathey’s damages, as measured by
the value of the interest he did not receive, was $150,000 in the City Lights Project and $750,000
in the Plaza at Turtle Creek Project? The majority finds some evidence to support the damages
on the City Lights Project but no evidence to support the damages on the Plaza at Turtle Creek
Project.
      The first pro-forma projection on the City Lights Project, under the section entitled “Investor
Future Sale Analysis,” shows a cumulative gain on sale in year 6 to be $13,095,200. Of course
Cathey never contended that he was entitled to 100 percent of the value of the project. He only
claimed damages as the percentage of the project that Meyer had promised him.


 Thus, the jury
could easily have determined that the amount of damages proximately caused to Cathey measured
as an amount if paid now in cash, for Meyer’s fraud, which the jury had already determined in
response to the liability question, was $150,000. In fact, it would appear based on this analysis
that anything up to $1,309,520, or possibly more, would be supported by the evidence, because
Cathey had testified Meyer had promised him a 10– to 15-percent interest in the City Lights
Project. Thus, I agree with the majority that there is some evidence to support a determination
of value represented of at least $150,000, and thus, damages of $150,000 on the City Lights
Project.
      Applying the same analysis to the Plaza at Turtle Creek Project, there is some evidence of
value as represented to support the jury’s determination of damages. The equivalent amount,
cumulative gain on sale for the Plaza at Turtle Creek Project at year 6, was $44,647,681.


 Cathey
testified that Meyer had promised him 20 percent of this project. Thus, there is some evidence
that the damages proximately caused to Cathey by Meyer’s fraud, as measured by Cathey’s interest
in the value represented less the value received could be as much as $8,929,536.20. Thus, the
jury’s determination of damages of $750,000 is supported by some evidence.
      Even if the jury were required to discount the future value, notwithstanding that it appears
from the pro-forma financial projections that the amounts have already been discounted, the jury’s
answers are still supported by some evidence.
      And now we come to the question I asked, to which I never received a satisfactory answer:
how is the evidence in support of the jury’s answer to the damages question on the City Lights
Project any different from the evidence on the Plaza at Turtle Creek Project?
      My answer is that there is no difference. Both are supported by some evidence. Thus, the
trial court erred in granting a take-nothing judgment if that judgement was based on a motion to
disregard the jury’s answers to these two questions because of no evidence to support damages. 
The majority errs in finding no evidence to support the jury’s answer as to damages for the Plaza
at Turtle Creek Project.
      What the majority tries to sell is the theory of looking forward from the date the damages
were to be measured to determine as a matter of law that there were no actual damages. The
majority looks forward in time to the foreclosure on the Plaza at Turtle Creek Project to say there
was no profit on the project, and thus, no evidence that Cathey would have received anything. 
This statement is only relevant to the majority’s analysis because the majority has redefined the
“value as represented.” See slip op. at 28-29, ___ S.W.3d ___, ___. The majority contends:
“The ‘represented value’ was that Cathey would receive a percentage of the profit, if any.” Id.,
slip op. at 28-29, ___ S.W.3d at ___.
      Our task on review does not include rewriting the jury charge. We review the sufficiency of
the evidence in light of the charge given. Osterberg v. Peca, 12 S.W.3d 31, 55 (Tex. 2000). If
the restructuring of the business entity through which profits were ultimately realized is the
controlling fact, as contended by the majority, the defendant would need only to defraud
investors/participants, and then change the form of the entity in which the investment, and
ultimately profits, are made. It would be a perverse rule of law that would allow a defendant to
cut off damages by such shenanigans. I reject it, as the jury also obviously rejected it.
      The majority expressly rejects the argument that the agreement “extends across time to these
events.” Slip op. at 29, ___ S.W.3d at ___. But the entire case was based upon just such an
agreement that by its very nature explicitly applied to future events. The majority characterizes
the basic terms of the agreement in this way: “The original agreement specifically pertained to the
development of the condominium project and any profit realized from it.” Id., slip op. at 29, ___
S.W.3d at ___.
      The trial evidence showed that there is a condominium project developed by Meyer that is
profitable. The current development is nothing more than a metamorphosis of the same project
into a new legal entity. The metamorphosis had the effect of cutting out the interest of another
investor, someone other than Cathey. The evidence showed that the other investor had also sued
Meyer for the manner in which the foreclosure/purchase/freeze-out was accomplished.
      Freezing out other investors by changing the legal entity through which the project was to be
accomplished does not have the legal effect the majority desires for two reasons. First, the same
type of process occurred with regard to other projects in which Meyer and Cathey were involved,
including the City Lights Project. Second, the charge did not limit the jury’s consideration to the
legal entities as initially contemplated but defined them broadly, and thus, the jury could properly
consider and reject the very evidentiary argument made by Meyer and now adopted by the
majority as a fact established as a matter of law.
      As to the first basis, on more than one of the Meyer-Cathey ventures, the legal structure of
the deal was decided long after the original agreement. Also, even after a venture was discussed
the structure of the deal could, and did, change.
      The City Lights Project was just one such venture. The venture as originally contemplated
and developed involved another Waco family, one heavily involved in and knowledgeable about
the movie theater business, the Schulmans. But as the venture progressed, Meyer was successful
in removing the Schulmans from the City Lights Project. This did not change the project, it
simply changed the ownership interest in the legal entity through which the venture was to be
accomplished.
      Likewise, Meyer’s purchase at his foreclosure on his own project—remember he was and
continued to be the money man for the project—which foreclosure had the legal effect of taking
one of the initial investors’ interest out of the venture, may have changed the legal entity through
which the project was accomplished, but it did not change the fundamental nature of the project. 
Nor did such a change affect the fundamental nature of the deal that Meyer had with Cathey.
      And for the second reason why changing the legal entity does not achieve the majority’s
desired effect, we must go back to the project as defined in the charge. The project is defined in
this way:
“Plaza at Turtle Creek Project” means the acquisition and development of certain property
in Dallas, Texas resulting in the construction of an apartment building referred to as “The
Plaza at Turtle Creek” and related land.

Meyer did not object to the definition given.
      The parties both presented extensive evidence related to Meyer’s foreclosure and purchase,
through a related entity, of the project. Meyer’s theory was that the foreclosure not only cut out
another investor, it also cut off any liability for damages that Meyer might have under his
agreement with Cathey.
      Cathey had presented evidence that his agreement transcended the form or mutations of the
business entities through which Meyer conducted the venture, and went to the substance of each
venture—his agreement, according to the evidence he presented, related to the Meyers family
interest. (Ct. R. vol. 25, at 26, ll. 04-14). Given the broad definition of the “Plaza at Turtle
Creek Project,” and given that the jury had heard all the evidence about the foreclosure, the jury
impliedly rejected Meyer’s evidence and argument about what effect the foreclosure had on
Cathey’s damages. The majority errs in resurrecting that evidence, disregarding the express
wording of the jury charge, and giving Meyer’s argument and evidence conclusive effect. In
effect the majority holding is not that there is no evidence of damages, but that as a matter of law
the foreclosure broke the causal connection between all the evidence of damages presented by
Cathey and the fraud committed by Meyer. With that holding and result I must disagree.
No Basis for Exemplary Damages?
      The majority’s error in determining that there is no evidence to support the fraud damages on
the Plaza at Turtle Creek Project is compounded in the next section of the majority opinion. The
majority holds that because “there is no evidence of actual damages for the Dallas [Plaza at Turtle
Creek] project,” and because “the exemplary damages question concerned both the Waco [City
Lights] and Dallas projects combined, and there was no objection or request to segregate
damages,” Cathey cannot recover exemplary damages for the Plaza at Turtle Creek Project
“because we cannot know how the jury proportioned exemplary damages between the two
projects, if it did.” Slip op. at 31, ___ S.W.3d at ___. Thus, the majority concludes, “we have
no basis on which to uphold exemplary damages for Cathey or render a different amount.” Id.,
slip op. at 31, ___ S.W.3d at ___.
      The majority’s holding is wrong for at least three reasons.
      First, as discussed above, under a proper analysis there is evidence to support actual damages
for the Plaza at Turtle Creek Project.
      Second, even if there was no evidence of actual damages on the Plaza at Turtle Creek Project,
as the majority notes there was no objection or request to segregate the punitive damages. Thus,
Meyer has failed to show, and is unable to show, that the jury’s answer on punitive damages could
properly be disregarded by the trial court, if that is the basis of the trial court’s judgment.
      Third, even accepting the majority’s rationale, this would be a proper situation in which to
suggest a remittitur.
Actual Damages
      The arguments about whether there is no evidence of actual damages for the fraud related to
the Plaza at Turtle Creek Project is fully discussed above, and there is no need to repeat it. 
Obviously, if I am right on that issue, the majority is wrong on this issue.
No Breakdown of Punitive Damages: No Objection to the Charge



      So now we must examine what should happen if the majority is correct in concluding there
is no evidence of actual damages for fraud on the Plaza at Turtle Creek Project. As the majority
notes, the issue submitted was conditioned in the disjunctive, and only provided for a single
answer. The question submitted was as follows:
If your answer to Question Number 20 is “Yes,” then answer the following
Question. Otherwise, do not answer the following Question.

QUESTION NUMBER 21:

What sum of money, if any, if paid now in cash, should be assessed against Meyer
and awarded to Cathey as exemplary damages, if any, for the conduct found in response
to Question Number 20?
“Exemplary damages” means an amount that you may in your discretion award as
a penalty or by way of punishment.
Factors to consider in awarding exemplary damages, if any, are—
      a.The nature of the wrong.
      b.The character of the conduct involved.
      c.The degree of culpability of Larry Meyer.
      d.The situation and sensibilities of the parties concerned.
      e.The extent to which such conduct offends a public sense of justice and propriety.

Answer in dollars and cents, if any.
ANSWER: $ 2,250,000.00 

The conditional language related to the question on whether the evidence was clear and convincing
that the harm to Cathey by Meyer resulted from fraud. Question 20 called for a single answer and
was conditioned on a “Yes” answer to either Question 5a or 5b that are quoted above.
      And as the majority notes, no objection or request to segregate punitive damages based on the
conduct the jury found in 5a versus the conduct the jury had found in 5b was made. The majority
erroneously puts the burden to object to the charge on Cathey. But at trial it was Meyer who had
the complaint about the answer, so it was Meyer’s burden to object and show the trial court why
it could not use that question and answer on which to base its judgment. Green Intl., Inc. v. Solis,
951 S.W.2d 384, 389-390 (Tex. 1997) (“Under these circumstances [where ‘neither party 
objected to the failure to segregate’], a trial court may disregard the jury finding only if it is
unsupported by the evidence or it is immaterial.”).
      On appeal, Cathey’s burden is only to show that the trial court could not properly disregard
the jury’s answer. Just because it is Cathey’s issue on appeal, does not mean that he had the
burden at trial to object to the issue as submitted.
      Could the trial court properly disregard the jury’s answer without an objection? No.
      The Texas Supreme Court has recently clarified this area of the law. The most relevant cases
are Thomas v. Oldham, Crown Life Insurance Co. v. Casteel, and Harris County v. Smith. Harris
County v. Smith, 96 S.W.3d 230 (Tex. 2002); Crown Life Ins. Co. v. Casteel, 22 S.W.3d 378
(Tex. 2000); Thomas v. Oldham, 895 S.W.2d 352 (Tex. 1995).
      In Thomas, the Supreme Court held that if the party against whom a broad-form damage
question is submitted does not object to it, the reviewing court must review the legal sufficiency
of the evidence supporting the whole verdict. Thomas, 895 S.W.2d at 352. In that case, a broad-form damage question asked the jury to consider five separate elements in arriving at a single
damage amount. The defendant did not object to the broad-form submission. In reaching its
verdict, the jury made notations in the margin next to each of the five elements of damage. These
notations totaled $500,000, which was the amount of the verdict. On appeal, the defendant
challenged the verdict, arguing that there was no evidence to support the amounts noted by the
jury on two of the five elements. The Court rejected the argument, observing that the jury’s
margin notations were not in legal effect “separate damage awards for purposes of evidentiary
review.” Thomas at 359. The Court further said that because the defendant had not asked for
separate damage findings, it could only challenge the legal sufficiency of the evidence supporting
the whole verdict. Id at 360. Because the defendant did not make this argument, the Court
rejected its evidentiary challenge. Id.
      In Casteel, the Supreme Court ruled that when a single broad-form liability question
commingles valid and invalid liability grounds and the appellant’s objection is timely and specific,
the error is harmful and a new trial is required when the appellate court cannot determine whether
the jury based its verdict on an invalid theory. Casteel, 22 S.W.3d 378. The court of appeals had
concluded in the case that the trial court’s submission, although error, was harmless because one
or more of the valid liability theories were supported by sufficient evidence. Casteel v. Crown
Life Ins. Co., 3 S.W.3d 582, 594-95 (Tex. App.—Austin 1997), rev’d, 22 S.W.3d 378. The
Court disagreed, concluding that the error was harmful because the erroneous submission, over
timely objection, affirmatively prevented the appellant from isolating the error and presenting its
case on appeal. The Court held that:
[W]hen a trial court submits a single broad-form liability question incorporating multiple
theories of liability, the error is harmful and a new trial is required when the appellate
court cannot determine whether the jury based its verdict on an improperly submitted
invalid theory. See Tex.R.App. P. 61.1 (“No judgment may be reversed on appeal . . .
unless the Supreme Court concludes that the error complained of . . . probably prevented
the petitioner from properly presenting the case to the appellate courts.”); see also 
Tex.R. App. P. 44.1(a).
Casteel, 22 S.W.3d at 388 (ellipses in orig.).
      In Harris County, the most recent case in this trilogy, the court of appeals had concluded that
Casteel applied only to “key issues” such as the submission of an invalid liability theory. Harris
County v. Smith, 66 S.W.3d 326, 334 (Tex. App.—Houston [1st Dist.] 2001), rev’d, 96 S.W.3d
230. It concluded that Casteel did not extend to damages because, according to the court of
appeals, a jury was less likely to include an invalid element of damages in its verdict than it was
to rely on an invalid theory of liability. Id. at 334-35; see also William V. Dorsaneo, III,
Broad-Form Submission of Jury Questions and the Standard of Review, 46 SMU L. Rev. 601, 630
(1992) (suggesting that it is reasonable to presume that the jury will notice when there is no
evidence to support an element of damage, but will not know that a liability theory is invalid). 
The court of appeals then concluded that the erroneous inclusion of an invalid element of damages
was harmless, even when identified by timely objection, so long as there was sufficient evidence
of other elements in the broad-form question on which the jury could have reached its verdict. 
Harris County, 66 S.W.3d at 336-38.
      Harris County argued that Casteel’s harmful-error analysis is not confined to questions of
liability. Harris County contended that a trial court’s error in instructing a jury to consider
erroneous matters, whether an invalid liability theory or an unsupported element of damages,
prevents the appellant from demonstrating the consequences of the error on appeal. Harris County
directed the Court’s attention to two courts of appeals’ decisions that had applied Casteel’s
reasoning to broad-form damage questions. Harris County, 96 S.W.3d at 233; see Wal-Mart
Stores, Inc. v. Redding, 56 S.W.3d 141, 154-55 (Tex. App.—Houston [14th Dist.] 2001, pet.
denied) (harmful error to submit over timely objection a broad-form damages question that mixes
valid and invalid measures of damages); Iron Mt. Bison Ranch, Inc. v. Easley Trailer Mfg., Inc.,
42 S.W.3d 149, 157 (Tex. App.—Amarillo 2000, no pet.) (same); see also In re J.M.M., 80
S.W.3d 232, 248 n. 6 (Tex. App.—Fort Worth 2002, pet. denied) (not reaching the issue of
whether Casteel applies to broad-form damages, but recognizing conflict in courts of appeals).
      The Court resolved the conflict and concluded that 
the trial court erred in overruling Harris County’s timely and specific objection to the
charge, which mixed valid and invalid elements of damages in a single broad-form
submission, and that such error was harmful because it prevented the appellate court from
determining “whether the jury based its verdict on an improperly submitted invalid”
element of damage. Casteel, 22 S.W.3d at 388; see also Tex.R.App. P. 61.1(b).

Harris County, 96 S.W.3d at 234.
      Casteel and Harris County would obviously apply to this case if there had been an objection
to the charge. There was not. Thus, whereas Harris County was more like Casteel, this case is
more like Thomas because there was no objection or request for separate damage findings. 
Accordingly, Meyer, in his post-verdict motion, could only challenge the legal sufficiency of the
evidence supporting the whole verdict.
      Thus, even if the majority is correct in holding that there is no evidence of actual damages for
the Plaza at Turtle Creek Project, the majority nonetheless errs by failing to conduct a legal-sufficiency review of the whole verdict for punitive damages in relation to the record and actual
damages found by the jury and affirmed by the majority for the City Lights Project, and upon
which the jury could therefore have based a punitive-damages finding. In other words: will the
actual damages on the City Lights Project support a punitive-damages award in the amount
determined by the jury? If it will, there is no need for the majority to engage in this cumbersome
process of a partial remand.
Majority’s Omissions: Remittitur and Punitive Damages Cap
      Finally, as to the punitive damages for fraud, and given the majority’s existing holding or a
holding under a proper analysis of Thomas that the punitive damages in relation to the actual
damages for the City Lights Project will not support the jury’s verdict, the proper remedy would
be first to suggest a remittitur, not a reversal and remand for a new trial to again determine
liability, damages, and punitive damages for the fraud in connection with the City Lights Project. 
Tex. R. App. P. 46.3. This is particularly apropos in this situation, where the jury exceeded the
damages cap, even including the finding of actual damages for fraud on the Plaza at Turtle Creek
Project. See Tex. Civ. Prac. & Rem. Code Ann. §§ 41.001-41.013 (Vernon 1997 & Supp.
2003). Under the statutory cap on punitive damages, the judgment for punitive damages is limited
to two times the economic damages determined by the jury. Id. § 41.008(b)(1)(A) (Vernon Supp.
2003)
      I contend, however, that the proper analysis, even if there is no evidence of damages on the
Plaza at Turtle Creek Project as the majority determined, and even if Meyer did not have to object
to the broad-form jury question, is to evaluate whether the evidence is sufficient to award punitive
damages as capped in relation to the damages the jury determined for the City Lights Project,
$150,000. Because of the statutory cap, this would be $300,000 of punitive damages. And there
is more than enough evidence to support a punitive-damages award in this amount. Alternatively,
by use of a remittitur, we should at least offer the parties the opportunity to engage in some
savings of judicial resources.
No Evidence of Damages for a Breach of Fiduciary Duty?
      In the next section of the opinion, “Breach of Fiduciary Duty Claim,” the majority makes yet
another substantive analytical error in determining whether there is evidence of damages for
breach of fiduciary duty by Meyer owed to Cathey. As you will recall, the majority determined
that because the property was foreclosed upon, notwithstanding that another entity controlled by
Meyer purchased the property at foreclosure, there was no profit and thus, no damages. The
majority then decides that because there was no “represented value” damages, for the same reason
there is also no evidence of damages under the breach-of-fiduciary-duty damages theory on the
Plaza at Turtle Creek Project. Balderdash.
      The elements of damages are entirely different for these two substantially different theories,
as well they should be. The most critical distinction, however, may not lie with the elements of
damages, but with the jury’s ability to consider the events and actions of Meyer in connection with
the foreclosure. For it is the very manner of Cathey’s discharge and the subsequent foreclosure
on which the jury could base its determination that Meyer breached the fiduciary duty he owed to
Cathey.
      No useful purpose would be served by a detailed review of all the evidence about the manner
in which Meyer conducted his business ventures. But during the trial the jury heard about several
business ventures besides the eight at issue in the charge. Cathey’s evidence presented an
unflattering picture of the manner in which Meyer conducted business.
      One practice that Cathey’s evidence was intended to highlight was the manner in which Meyer
would attract other businesspeople to participate at some level in a venture. And at a later date,
if the venture appeared to be profitable, he would take action to freeze out the interest of a
minority investor. Alternatively, if for some reason Meyer decided he was no longer interested
in the venture, he would take action that would force the other investors to buy out Meyer’s
interest in the venture to protect the value of their investment.
      With this evidence of what Cathey presented as a pattern of the manner in which Meyer
routinely conducted business, the jury’s implied determination that the foreclosure on the Plaza
at Turtle Creek Project was just such a transaction is well supported. And further, because the
jury had determined that Meyer had a confidential relationship with Cathey, the jury could
properly have decided that the purchase at foreclosure by a Meyer-owned company did not affect
the damages Cathey had proven were caused by Meyer’s breach of fiduciary duty owed to Cathey.
      And we must also remember there was evidence that Cathey’s interest was to be a percentage
of the Meyer family’s interest, essentially in whatever form that interest might mutate.



      Lastly, lest we forget, there is the pro-forma financial information showing the projections
and expectations of Cathey and Meyer when embarking upon this particular venture. (Plaintiff’s
Ex. 195). This exhibit alone, when considered in the context of the elements of damages that the
jury was instructed to consider, provides all the evidence needed to support fully the jury’s
determination of damages. The jury instruction and question on damages as a result of the breach
of the fiduciary duty were as follows:
If your answer to Question Number 10a or 10b [regarding the determination of a
failure to comply with a fiduciary duty owed to Cathey by Meyer] is “Yes,” then answer
the following Question. Otherwise, do not answer the following Question.

QUESTION NUMBER 11:
What sum of money, if any, if paid now in cash, would fairly and reasonably
compensate Cathey for his damages, if any, that were proximately caused by such breach
of fiduciary duty in the City Lights Project and/or Plaza at Turtle Creek Project?
Consider the following elements of damages, if any, and none other: the value of any
property, income, or business interests lost as a natural, probable, and foreseeable
consequence of Meyer’s breach of fiduciary duty.

Answer separately in dollars and cents, if any, for each of the following, if any,
to which you answered “Yes” in response to Question Number 10.
11a.City Lights Project$ 150,000.00 
11b.Plaza at Turtle Creek Project$ 750,000.00 
This instruction gave the jury wide latitude to consider all the evidence of damages for the breach
of the fiduciary relationship that the jury had determined to exist.
      There are two further reasons why the majority’s use of the foreclosure as a basis to conclude
that there is no evidence of damages for breach of fiduciary duty is erroneous. First, the jury must
be allowed some latitude in determining damages under these circumstances. The foreclosure did
not happen until two years after Cathey was discharged and after this suit was filed. Especially
in light of the evidence discussed above, the jury could have determined that the project’s
economic crisis that led to the foreclosure resulted from events that Meyer caused after he had
breached the fiduciary duty owed to Cathey. We should not limit Cathey’s damages based on
Meyer’s conduct after the breach.
      A second but related reason why the majority analysis is erroneous is that this type of damage
evidence is never precise. Subsequent events may provide some evidence of what the damages
are, but seldom, if ever, could subsequent events conclusively establish there were no damages
at all.
      In this case, Cathey put into evidence two points of view from which the jury could measure
his damages. He put into evidence what he expected at the date of the breach, looking forward
to what was expected. This was in the form of the pro-forma financial projections. He also put
into evidence actual events as they developed. The evidence of the events that actually occurred
shows that while the projections may have been inaccurate, the project, as defined in the charge,
was a profitable project—profit of which Cathey was deprived by Meyer’s breach of fiduciary
duty.
      The jury was fully within its province to take all this evidence, both the financial projections,
which certainly were evidence of Cathey’s expectations, as well as actual data as it developed, and
after weighing all this and the other evidence of the success and value of the projects, to determine
Cathey’s damages.
      And a final note about the effect of the foreclosure: the jury could easily have determined that
Cathey’s interest should have been, and but for the breach of the fiduciary duty would have been,
protected as part of the foreclosure process. Certainly if Cathey had continued to work for Meyer,
Meyer would have been obligated to protect Cathey’s interest in the project because of the
fiduciary relationship that existed between them. Again I say, Meyer should not be allowed to use
events that he controlled that took place after the breach of the fiduciary duty to limit Cathey’s
damages.
      Thus, I agree that there is evidence to support the finding that Meyer owed Cathey a fiduciary
duty. I also agree that there is evidence to support the jury’s damage award as to the City Lights
Project. I disagree, however, with the majority’s conclusion that there is no evidence to support
the jury’s determination of damages resulting from the breach of the duty for the Plaza at Turtle
Creek Project.
No Evidence of Ratification or Waiver?
      We must now turn our attention to the defenses that the jury found in favor of Meyer.
Specifically we must address the tension between the jury’s finding of fraud by Meyer on the one
hand and a finding of ratification and waiver of that fraud by Cathey on the other.


 
      The tension to which I refer is caused by the question related to fraud, as defined in the
charge, as compared to the questions regarding ratification and waiver, also as defined in the
charge. Specifically the tension relates to timing. It relates to the timing of the conduct of Meyer
found to constitute fraud and the conduct of Cathey found to constitute ratification or waiver. As
the majority notes, Cathey’s conduct before the fraud cannot constitute ratification or waiver of
the fraud.
      So the easiest way to address this issue is first to line up the events chronologically. The jury
has, for the most part, determined what critical events occurred. Cathey should recover for each
event that resulted in damages as a result of Meyer’s fraud if the event occurred before Cathey
became aware of the fraud or breach. But the chronology may not be as simple as it seems,
because the jury did not determine a date certain on which Cathey became aware of the fraud or
breach as to any particular venture.
      The events occurred in the following order:
      1.   1992—Meyer and Cathey team up.
      2.   1993—Silverado Apartments venture. 
      3.   1993—Polo Club Apartments venture.
      4.   1995—Valley Ranch Apartments venture. 
      5.   1995—Arbors Apartments venture.
      6.   1995—Refinancing of the Silverado Apartments.
      7.   1995—Refinancing of the Arbors Apartments.
      8.   1995—City Lights Project venture.
      9.   1996—Plaza at Turtle Creek Project venture.
      10. 1996—Meyer and Cathey cease working together. August 13, 1996, is the date the jury
determined the fiduciary relationship ended.

      And this now brings us to the most critical question, the question on which the ultimate result
in this case turns: What was the conduct that the jury found to be fraudulent as to each of the
events summarized above in items 2 through 9? For it is only the conduct that the jury found to
constitute fraud that is the subject of the questions regarding ratification and waiver.
      This brings us to a fundamental problem that I refer to as dancing with two theories. Cathey
went to trial—the dance. Cathey presented two different views of the events, his version of what
the evidence established, under which he believed he was entitled to recover—two theories. Thus,
he was dancing with two theories in front of the jury. This is dangerous, because as the charge
was structured the jury was allowed to decide which theory, if either or both, was what actually
happened. But we are not able to tell which theory the jury decided upon. Let me explain.
      The first theory of the evidence is that there was a global agreement between Cathey and
Meyer regarding the developer activities. Under this theory of the evidence, the jury was
presented evidence upon which they could determine that Cathey was entitled to a 20-percent
ownership of any venture that Cathey brought to Meyer, 10-percent ownership of any venture that
Meyer discovered but on which Cathey performed services, and a $25,000 bonus for each
completed refinancing. But lest I summarize the two major provisions of the alleged agreement
incorrectly, let Cathey tell you in his own words what the essence of the “global agreement” was:
Q.Mr. Cathey, did you and Larry Meyer have a discussion as to how you would
be compensated on real estate purchases that you-all might make as you continued
together?
A.Yes, sir.
Q.And tell us what that discussion was, please.
A.That discussion was regarding Silverado and at the beginning of acquiring real
estate assets, and Larry said I would receive 20 percent on those projects which I found
and 10 percent which he found or that were Meyer-family related, that came in through
Larry’s efforts.

(Ct. R. vol. 23, at 47, l. 15–48, l. 2).
      And I think it helpful to see how Cathey applies his understanding of the “global agreement”
to an individual venture.
Q.Now, I take it from what you say—And you have sued in this lawsuit saying that
you’re entitled to 20 percent of something related to The Plaza at Turtle Creek; is that
correct?
A.Yes, sir.
Q.You’re not suing here for 10 percent or five percent or any different number. 
You’re suing for 20 percent; is that correct?
A.Yes, Sir.
Q.And you say that the reason you should get that is because of a verbal contract
that you say was made before January 18 of 1993 between you and Larry Meyer; is that
correct?
A.Yeah. And reinforced all the way through, yes, sir.
Q.Well, you say the contract was made back there in early January of 1993; is that
correct?
A.Yes, sir.
      Q.  Now, The Plaza came up as an opportunity in the middle of 1995; is that
correct?
      A.  Yes, sir.
Q.And you say that you found that [property for the Plaza at Turtle Creek Project];
is that right?
AYes, sir.

(Ct. R. vol. 31, at 135, l. 12–136, l. 10) .
      Under this theory, there was a “global agreement,” and each of the contracts on the individual
ventures would effectively be the payments, the compensation due, to fulfill the “global
agreement.”
      The second theory of the evidence is that there was a series of agreements, each resulting in
a separate and independent contract. Under this theory of the evidence, each separate venture,
while arising in its inception out of the relationship between Cathey and Meyer, would be
documented as individual contracts. Under this theory of the evidence, Cathey sought to explain
why each and every individual contract deviated from the “global agreement.” I hope that the
reader will forgive the length of the following excerpt, but it exemplifies just a small fraction of
the conflicting testimony the jury heard during this six-week trial.
Q.Let’s look at Defendant’s Exhibit 252. Do you have that?
A.Yes, sir.
Q.All right. Mr. Richardson asked some questions about this. I want to ask you
first of all: You prepared this, didn’t you?
A.Yes, sir.
            Q.  And this says, “John Cathey ownership,” doesn’t it?
            A.  Yes, sir.
Q.Other than—How many are there on here? Three, six. There are 14 different
projects; is that correct?
A.Yes, sir.
Q.The only one under there that has the percentage that would be called for under
the global agreement that you have told us about is Silverado; isn’t that correct?
A.That’s—Yes, sir.
Q.And so, if we go down these—For example, Polo Club. If there had been a
global agreement that had been applied, that would have been 10 percent, right?
AYes, sir. But the—that agreement had already been written.
Q.Well, sir, I’m asking you: If we just took the global agreement that you say
existed, that you were—going to make you a partner and everything, let’s see how it
applies to the list that you prepared. Polo Club should be 10 percent, right?
A.But the agreement had already been written, but it should have been—
Q.Sir—
A.—and was originally 10 percent.
Q.Sir, in each of these instances, unless I tell you differently, I’m asking you to
simply take your verbal global agreement that you say, and let’s apply it to these projects,
and see what percentage would have been had that applied. Okay?
A.Okay.
Q.Polo would have been 10 percent, right? Not five and a half, right?
A.Yes, sir.
Q.Burnett Field would have been 20 percent and not 10 percent; is that right?
A.Well see, again, Larry and I already had a deal on Burnett Field and Site 6.
Q.Sir, first of all I’m just asking you to apply the global agreement and see how
the percentages would have been different. Isn’t it true that under the global agreement,
Burnett Field would have been 20 percent?
A.No, sir, because that was a casino site.
Q.Oh. So, when you said that the global agreement was for everything that Larry
Meyer did back there in early 1993, did you have an agreement that it wouldn’t include
casino opportunities?
A.Not the original agreement. We later came back and said it would not apply to
casinos.
Q.And, in fact, as you were describing these for Mr. Richardson . . . correct me
if I’m wrong . . . you said, “Well, the deal wouldn’t apply to Polo, because we changed
it and I agreed to change it.”
The deal wouldn’t apply to Burnett Field and Site 6 because that was a different
kind of property.
It wouldn’t apply to Kemah because I had a different percentage there or Dallas-Harrah’s or any of the other Harrah’s.
Olympian, it wouldn’t apply on my 20 percent, because I was trying—we were
changing it to try to catch up, and so I put in 25 percent.
Dyson Apartments, you put in 20 percent there; is that correct?
A.Yes, sir.
Q.That never happened, did it?
A.No, sir. That never closed.
Q.JLM profit pool, one percent. And FM Properties three percent. And I believe
you said that was three percent rather than 10 or 20 because the properties were so big?
A.Yes, sir.
Q.And also that there were outside partners that were going to be involved?
            A.  Yes, sir.
            Q.  Of course, there were outside partners that were going to be involved?
            A.  Yes, sir.
      Q.  Of course, there were outside partners involved in The Plaza at Turtle Creek,
correct?
      A.  There was.
      Q.  And there were outside partners involved in City Lights, correct?
A.Yes, sir.
Q.And in VR27; is that right?
A.Yes, sir.
Q.And The Plaza at Turtle Creek was a big project, correct?
A.Yes, sir.
Q.So, The Plaza at Turtle Creek had the two characteristics that you say caused
FM Properties to be a smaller percentage that would have been under the global
agreement, correct?
A.Yeah. But this applies right here—the three percent is applying to the total deal
right there.
Q.Well, sir, in fact, on Plaza, weren’t you still negotiating what the percentage
would be as late as just a few days before your business relationship concluded?
A. “Negotiating”.
Q.Didn’t we see a document—
A.Yes, sir.
Q.—just before lunch where you said, “How about five to seven percent on The
Plaza?”
A.Yes, sir.
Q.Didn’t we just see that a little while ago?
A.Yes, sir.
Q.You were still negotiating as of July of 1996 with Larry Meyer on what
percentage you might get in The Plaza, weren’t you?
A.Yeah, five to seven percent of his total ownership of the 64. I was trying at that
time to—when nothing was negotiable, I was trying to salvage something from that, yes,
sir.
Q.But my question is: In July of 1996, you were negotiating with Larry Meyer. 
You were seeking five to seven percent on The Plaza project, weren’t you?
A.What was the date?
Q.In July of 1996.
A.Yes, sir.
Q.And then going down, you put Arbors 15 percent. Of course, under the master
agreement, you would get 10 percent; is that correct?
A.Yes, sir.
Q.And Austin Travis County, you put in 15 percent, right?
A.Yes, sir.
Q.And that’s not a percentage you would have gotten under the master agreement,
is it?
A.No, sir. May I explain The Arbors percentage?

((sic) Ct. R. vol. 37, at 30, l. 14–36, l. 2). Whereupon the testimony went off in another
direction.
      Of course this second theory presented a practical problem for Cathey. First, without the
“global agreement,” he had no agreement, written or verbal, on the two largest, most lucrative
projects—City Lights Project and Plaza at Turtle Creek Project. Nor would he have a contract
on the compensation that he alleged he was due for refinancing.
      So what was the jury to do? As every jury is asked to do—resolve the conflict. And this was
a conflict of theories of evidence, not a conflict of legal theories. The legal theory was singular:
fraudulent inducement. The jury was asked to determine if Meyer had fraudulently induced
Cathey. The jury was then asked if Cathey had ratified or waived “the conduct of Meyer, if any,
that [the jury] found constituted fraud.” Only the jury knows what conduct it had found
constituted fraud.
      So what are we to do? We must determine whether there was evidence of ratification or
waiver of any theory of fraud presented by Cathey. Where the majority errs in its analysis is that
it has decided that the fraud the jury found was directly related to the contracts on the individual
ventures, and not based upon the possibility that the fraud found by the jury was the conduct by
which Meyer induced Cathey to enter into the original relationship with Meyer—the inducement
to enter into the “global agreement.”
      The majority’s myopic view of the allegations and evidence of fraud, and thus, of the actions
of Cathey that would constitute ratification or waiver, prevent it from seeing the big picture that
the jury could see. And more importantly, it is the big picture of Meyer’s conduct that the jury
could determine was fraudulent, and Cathey’s conduct that the jury could determine was
ratification and waiver, that we must review.
      And Cathey knew from the very first venture that Meyer had breached the agreement that
Cathey alleged existed between them, the “global agreement.” Cathey’s testimony relating to the
first consummated real-estate deal is as follows:
Q.. . . Now let’s go back, Mr. Cathey, and—just briefly. After the agreement with
the —Well first, when you got the Silverado agreement and it showed a 20-percent
distribution, was that what you and Larry Meyer had talked about?
A.No, sir.
            . . . .
Q.. . . What did you and Larry Meyer talk about?
A.We talked about a 20-percent ownership of the Silverado.
Q.Okay. And what was the reason Larry Meyer gave you as to why you were
getting a distribution interest instead of an ownership interest?
A.He needed the distribution structure set up because of his personal tax
requirements. And he needed the full tax deductions from being, you know, the 100-percent owner.
Q.Did Mr. Meyer ever ask you if that was okay with you?
A.No, sir.

(Ct. R. vol. 36, at 102, l. 13–103, l. 14).

      And the jury was not asked just about awareness of the fraud, which is all the majority
addresses. By way of the definitions of ratification and waiver, the jury was also asked about
awareness of a “breach” of the agreement that the jury found to have been induced by fraud, in
both the question related to ratification and the question related to waiver. The testimony quoted
is certainly some evidence that Cathey knew of a breach of the “global agreement” prior to signing
the Silverado distribution agreement.
      So when I review the same six weeks of evidence that the jury reviewed, and ask myself the
question, “Is there some evidence that Cathey was aware that Meyer breached the ‘global
agreement’?”, my answer is, “Yes.” Cathey testified that as to their very first venture he did not
receive what he thought he was entitled to. Thus, he expressly agreed to accept less than what he
thought himself entitled to when he signed the very first written contract on an individual venture,
the Silverado Apartments Contract. That was all that the jury needed to hear to be able to answer
the questions on ratification and waiver in the affirmative. But the jury heard much more than just
the brief excerpt of Cathey’s testimony above. The jury’s “yes” answer is supported by legally
sufficient evidence. Accordingly, the trial court was correct if its judgment that Cathey take
nothing from Meyer on the fraud claim was rendered on the basis that Meyer had established the
defenses of ratification and waiver.
      This analysis of the evidence also reflects why the majority’s analysis of Fortune Production
Co. is flawed. See Fortune Prod. Co. v. Conoco, Inc., 52 S.W.3d 671 (Tex. 2000). The majority
construes this case as being like that of Fortune and Tucker, the gas producers in Fortune who had
agreements with Conoco to sell their gas at a fixed price. Fortune and Tucker had an existing
contract that required them to deliver their production to Conoco, and they continued to operate
under that agreement. Unlike these producers, Cathey did not have a continuing obligation to
work for Meyer. Cathey could have walked away from his arrangement with Meyer at any time
with no continuing obligation to provide services of any kind to Meyer. In this sense, Cathey’s
arrangement was like that of employment at will, in which the employee can leave at any time. 
See Tex. Farm Bureau Mut. Ins. Cos. v. Sears, 84 S.W.3d 604 (Tex. 2002) (discussing
employment-at-will relationship). Thus, Cathey’s relationship with Meyer was more like that of
Cox and Hankamer, the producers in Fortune who did not have a written contract to provide gas
to Conoco. In Fortune, the Court held that because Cox and Hankamer did not have a continuing
obligation to sell their gas to Conoco, but continued to do so after they knew of the fraud, they
had ratified the fraud, and were therefore not entitled to any recovery. Fortune at 679-80. 
Likewise, Cathey should be barred from any recovery, because after he was aware of the breach,
which by the definitions in the charge would constitute ratification and waiver of the fraud, he
continued to work for Meyer although he was not obligated to continue to perform those services. 
The jury could have viewed the evidence of Cathey’s acceptance of what Meyer was willing to pay
for his services in either of two ways: (1) that Cathey was ratifying the fraud that induced him into
the relationship; or (2) that Cathey was waiving that fraud, thus, putting his confidence in Meyer,
and relying on Meyer to treat him fairly with regard to the compensation paid on each venture.
No Discovery Abuse to Support a Post-Trial Award of Sanctions?
      The majority also errs in sustaining Cathey’s sixth issue, concerning the trial court’s
imposition of sanctions for Cathey’s false responses to discovery requests. This is an unusual case
in which Cathey, during discovery, falsely answered interrogatories, falsely denied requests for
admission, and falsely testified at depositions; then, at trial, recanted, testified truthfully, and
admitted that he had lied. Under these extraordinary circumstances, the trial court did not abuse
its discretion in imposing monetary sanctions for Cathey’s perjury, which took place during
discovery, but did not become manifest until Cathey testified at trial. The majority relies on cases
cited by Cathey, and his interpretation of those cases, which do not apply under the circumstances
of the instant case. See Remington Arms Co. v. Caldwell, 850 S.W.2d 167 (Tex. 1993) (orig.
proceeding).
      The discovery sanctions concern Cathey’s resume, which he offered into evidence at trial. 
In Meyer’s motion for sanctions, he alleged several particulars in which Cathey’s resume was
false: (1) that Cathey had been executive vice president of a computer company, and had
completed a large contract for that company; (2) that he had owned a television station, and had
nationally syndicated two television programs; and (3) that he held university degrees and other
academic honors. During discovery, by Cathey’s answers to interrogatories, responses to requests
for admission, and deposition testimony, Cathey had maintained the truth of these statements in
his resume. During discovery, Meyer obtained deposition testimony that tended to contradict
these statements, one witness for each matter except concerning Cathey’s academic record, for
which Meyer deposed two witnesses. At trial, Cathey admitted that he had lied. Most clearly,
when confronted with the matter of never having been an employee, much less an officer, of the
computer company, Cathey testified, “That’s come to my attention. I was a consultant . . . .”
      The majority emphasizes the general rule, that “the failure to obtain a pretrial ruling on
discovery disputes that exist before commencement of trial constitutes a waiver of any claim for
sanctions based on that conduct.” Slip op. at 41, ___ S.W.3d at ___ (quoting Remington Arms,
850 S.W.2d at 170). This rule serves a beneficial purpose: “By requiring a pretrial ruling on
existing pretrial disputes, the parties are better able to organize and present their cases without
surprise.” Finlay v. Olive, 77 S.W.3d 520, 526 (Tex. App.—Houston [1st Dist.] 2002, no pet.).
      But as well established as this rule is the exception: “[i]f pretrial discovery abuse is not
revealed until after the trial has begun, or even after trial, a party cannot be said to have waived
a claim for sanctions.” Remington Arms, 850 S.W.2d at 170; see F & H Invs., Inc. v. State, 55
S.W.3d 663, 671-72 (Tex. App.—Waco 2001, no pet.). “[N]othing in the Remington opinion can
be read to apply to a situation where the failure to properly comply with discovery was not
discovered prior to the commencement of the trial.” City of Dallas v. Ormsby, 904 S.W.2d 707,
711 (Tex. App.—Amarillo 1995, writ denied) (op. on orig. submission).
      The majority believes that Meyer should have moved for sanctions pretrial. The majority
states that Meyer had “a reasonable evidentiary basis on which to base a pre-trial motion for
discovery sanctions.” Slip op. at 42, ___ S.W.3d at ___. This holding flies in the face of the trial
court’s findings of fact, to which we must give deference. See IKB Indus. v. Pro-Line Corp., 938
S.W.2d 440, 442 (Tex. 1997). The trial judge, a visiting judge who presided over trial and over
the sanctions hearing, stated that neither he nor the elected judge of the court, who presided over
discovery in the case, would have ruled on the basis of the evidence available before trial that
Cathey’s pretrial statements were perjured. Indeed, at the sanctions hearing, Cathey maintained
that even at trial the matters in Meyer’s motion were still hotly contested.
      The imposition of sanctions is in the court’s discretion. Walker v. Gutierrez, 46 Tex. Sup.
Ct. J. 812, 815, 2002 WL 32116846, at *4 (June 19, 2003); Am. Transitional Care Ctrs. of Tex.,
Inc. v. Palacios, 46 S.W.3d 873, 877 (Tex. 2001). “The test for abuse of discretion is ‘whether
the court acted without reference to any guiding rules or principles,’ or, stated another way,
whether its decision was arbitrary or unreasonable.” City of San Benito v. Rio Grande Valley Gas
Co., 46 Tex. Sup. Ct. J. 861, ___, 2003 WL 21468760, at *5 (June 26, 2003) (quoting Downer
v. Aquamarine Operators, Inc., 701 S.W.2d 238, 242 (Tex. 1985)). Matters of degree are
especially suited to the exercise of discretion. See TCI Cablevision of Dallas, Inc. v. Owens, 8
S.W.3d 837, 847 (Tex. App.—Beaumont 2000, pet. dism’d by agreement) (quoting Allison v.
Citgo Petroleum Corp., 151 F.3d 402, 416 (5th Cir. 1998)).
      The trial court did not abuse its discretion in holding that Meyer’s sanctions motion was
timely. In short, the trial judge awarded sanctions because he did not believe that a party should
be insulated from sanctions for perjurious conduct merely by keeping the issue contested until the
beginning of trial. As the judge noted, under the interpretation of Remington Arms advanced by
Cathey, so long as a discovery abuser could maintain plausible deniability throughout the
discovery period, there would be no effective discovery sanction for perjury in discovery. Once,
as here, the presiding judge observes the discovery abuse move from murkiness to clarity, the
judge, in the exercise of discretion, must have the power to sanction it.
      Indeed, one of the reasons for which the trial court awarded sanctions was Cathey’s
slipperiness. At the sanctions hearing, the trial court said of Cathey, “I agree that this was the
most evasive witness I think I have ever listened to, and he—used more language to keep from
asking [sic] a question than any person I have ever met.” The court noted that Meyer had, in the
court’s words, only a “clue” that Cathey’s discovery responses were subject to attack, but not
enough evidence to support a pretrial motion for sanctions. The trial court deemed it particularly
significant that Cathey never withdrew, amended, or supplemented his perjured responses to
requests for admissions, answers to interrogatories, or deposition testimony, prior to trial.
      In this connection, the case cited by Cathey is distinguishable. See Songer v. Clement, 20
S.W.3d 188 (Tex. App.—Texarkana 2000, no pet.). In Songer, the plaintiffs alleged that the
defendant’s sand mining operations caused their lung disease. Id. at 189-90. Among the evidence
that came to light during discovery, and which was known to both parties at that time, was recent
video recordings of the plaintiffs smoking cigarettes, and recent statements to their physicians that
they smoked between one and a half and two packs of cigarettes a day. Id. at 190, 192. In
deposition, nonetheless, the plaintiffs testified that they had not smoked significantly since at least
1990. Id. at 190. At trial, after the plaintiffs testified in accordance with their deposition
testimony, the defendant introduced the video recording and medical records, and moved for
death-penalty discovery sanctions. Id. at 190-91. The court of appeals held that the defendant
waived its motion for sanctions by waiting until trial before moving for sanctions. Id. at 193. 
Songer, in which the video evidence and the plaintiffs’ own admissions in medical records clearly
established perjury, is clearly distinguishable from the instant case, in which, in Meyer’s words,
the pretrial evidence only created a “swearing match” between Cathey and another witness.
      Both Remington Arms and the cases applying its general rule concern typical discovery
disputes, such as the untimely production or failure to produce documents in response to discovery
requests. See Remington Arms, 850 S.W.2d at 169 n. 4. Perjury, however, is not a typical
“discovery dispute.” The discovery disputes contemplated by Rule 215 concern the failure to
respond to discovery requests or orders. See, e.g., Tex. R. Civ. P. 215.2(b)(2) (failure to appear
for deposition or failure to answer deposition question), 215.2(b)(3) (failure to answer
interrogatory) 215.4(a) (insufficient answer to request for admission). Cathey did not fail to
participate in discovery; he appeared and testified at depositions, answered Meyer’s
interrogatories, and denied Meyer’s requests for admission, but the substance of Cathey’s
participation was false. Thus, the rationale of Remington Arms does not apply.
      The majority also fails to address Meyer’s contention that the trial court had the authority to
sanction Cathey under its inherent power. We have held that “a trial court has inherent power,
subject to an abuse of discretion standard, to impose sanctions not covered by rule or statute to
discipline an attorney’s behavior” as well as that of a party. See Fox v. Parker, 98 S.W.3d 713,
728 (Tex. App.—Waco 2003, pet. stricken); accord Kings Park Apts., Ltd., v. Nat’l Union Fire
Ins. Co., 101 S.W.3d 525, 540-41 (Tex. App.—Houston [1st. Dist.] 2003, pet. filed); In re
N.R.C., 94 S.W.3d 799, 807-808 & n. 4 (Tex. App.—Houston [14th Dist.] 2002, pet. denied). 
This contention bears consideration.
      For these reasons, Remington Arms and the other cases cited by Cathey do not control in this
case. The trial court was within its discretion to sanction Cathey for his perjurious conduct in
discovery. Accordingly, Cathey’s sixth issue should be overruled. Because the majority sustains
the issue, I respectfully dissent.
CONCLUSION
      So where does this leave the jury’s verdict in relation to the judgment? Cathey lost the benefit
of the jury findings of fraud and damages because Meyer established the affirmative defenses of
ratification and waiver. And because Cathey is not entitled to any actual damages on his
fraudulent-inducement claim, Cathey is also not entitled to recover any exemplary damages from
Meyer. This is consistent with the trial court’s judgment. But the trial court erred in refusing to
award judgment in favor of Cathey, as found by the jury, for Meyer’s breach of the fiduciary duty
owed Cathey with regard to the City Lights Project and the Plaza at Turtle Creek Project. And
the judgment should include pre– and post-judgment interest, and costs. The trial court did not
err, however, in its finding that Cathey should be sanctioned for discovery abuse.
      Accordingly, I would render judgment in favor of Cathey for the breach of fiduciary duty
claims determined by the jury in the amount of $900,000 ($150,000 for the City Lights Project
and $750,000 for the Plaza at Turtle Creek Project), statutory interest, and costs, with an offset
for the sanctions for discovery abuse as determined by the trial court in the amount of $25,978.73. 
Because the majority does not do so, I respectfully dissent.
 
 
TOM GRAY
Justice
 
Dissenting opinion delivered and filed August 4, 2003
[CV06]