**BURLINGTON RESOURCES OIL & GAS COMPANY, LP, Appellant**

**v.**

**PETROMAX OPERATING CO., INC., Woodbine Acquisition, LLC, n/k/a MD America Energy, LLC, Petro Texas, LLC, CH4 Energy II, LLC, and Texcal Energy South Texas, LP, Appellees**

No. 06–15–00044–CV

Court of Appeals of Texas, Texarkana.

Submitted: January 28, 2016

Decided: March 10, 2016

---

Roger Townsend, Alexander Dubose Jefferson & Townsend, LLP, W. Fred Hagans, Kendall Montgomery, Hagans Burdine Montgomery & Rustay, Houston, TX, Kirsten M. Castaneda, Alexander Dubose Jefferson & Townsend, LLP, Dallas, TX, Vincent Lee Marable, Paul Webb, PC, Wharton, TX, John R. Mercy, Mercy * Carter * Tidwell, LLP, Texarkana, TX, for appellant.

Richard B. Phillips, Gregory D. Binns, Greg W. Curry, Thompson & Knight LLP, Dallas, TX, Jeffery C. Lewis, Atchley, Russell, Waldrop & Hlavinka, LLP, Texarkana, TX, for appellee Woodbine Acquisition, LLC.

David M. Gunn, Davis J. Beck, Thomas Edward Ganucheau, Beck Redden & Secrest LLP, Houston, TX, Brad C. D'Amico, Cantey Hanger LLP, Dallas, TX, for appellee Petromax Operating Co., Inc.

Deborah G. Hankinson, Stephanie Dooley Nelson, Hankinson LLP, Dallas, TX, Jesse R. Pierce, Brian K. Tully, Pierce & O'Neill LLP, Houston, TX, for Texcal Energy South Texas, LP.

Before Morriss, C.J., Moseley and Burgess, JJ.

## OPINION

Opinion by Justice Moseley

This case involves the adjudication of the parties' interests in certain oil and gas leases located in Brazos County.[1] Burlington Resources Oil & Gas Company, LP, sued PetroMax Operating Co., Inc. (Petro-Max), Woodbine Acquisition, LLC (Woodbine), Petro Texas, LLC (Petro Texas), CH4 Energy II, LLC (CH4), and TexCal Energy South Texas LP (TexCal) (collectively Appellees), for allegedly acquiring oil and gas interests to which Burlington had a claim. In an effort to obtain a declaratory judgment that would settle its claim to the oil and gas interests in question, Burlington filed a motion for partial summary judgment directed at Woodbine and PetroMax. In response, Appellees filed a motion for summary judgment arguing that the evidence conclusively established that Burlington no longer owned the interests it claimed. The trial court

---

1. Originally appealed to the Tenth Court of Appeals in Waco, this case was transferred to this Court by the Texas Supreme Court pursuant to its docket equalization efforts. *See* Tex. Gov't Code Ann. § 73.001 (West 2013). We follow the precedent of the Tenth Court of Appeals in deciding this case. *See* Tex.R.App. P. 41.3.

agreed, granted Appellees' motion for summary judgment, and denied Burlington's partial motion for summary judgment.

Burlington has appealed. We conclude that because the summary judgment evidence conclusively established that Burlington conveyed the interests it now claims, it no longer stands in a contractual position to assert its claim. Because our holding on the first issue presented is dispositive of the appeal, we do not discuss other points specifically. We affirm the trial court's judgment.

## I. Factual Background

### A. The 1975 Original Agreement

Buttes Resources Company owned an undivided one-half working interest in nine oil and gas leases. In 1975, Buttes entered into an agreement with Aztec Oil & Gas Company to cooperate in the exploration, development, and operation of nine oil and gas leaseholds (the Original Agreement). On Aztec's payment of its share of the costs and expenses under the Original Agreement, Buttes agreed to assign it an undivided twenty-five percent of its interest in the nine leases.

█ In addition to the agreement to jointly explore the existing nine leaseholds, the Original Agreement denoted an Area of Mutual Interest (AMI) to promote joint acquisition and exploration of future leaseholds.[2] Under the Original Agreement, if Aztec acquired any further oil or gas leases or mineral rights in the AMI, it was required to offer Buttes an undivided seventy-five percent of the acquired interest in the lease. Conversely, if Buttes made an acquisition in the AMI, it would offer Aztec an undivided twenty-five percent of the acquired interest in the lease. Each of these offers was required to be made in writing, with each party having fifteen days in which to accept or reject the offer.

If a party accepted the offer of interest, it was required to reimburse the other party for its proportionate share of the acquisition cost. If an interest within the AMI became jointly held by the parties, both joint owners would be subject to the terms of a joint operating agreement, which required the party drilling a well on the leasehold to notify the other party and provide it with a chance to participate in the endeavor by sharing the project cost.

The Original Agreement included a map of the AMI and further provided that the AMI would "last as long as leases are jointly owned within such area." It is undisputed that only "[t]hree of the original leases remain in the AMI" (to which the parties refer as the Gibbs Lease, the Wilson Lease, and the Buchanan Lease). In its response to Appellees' motion for summary judgment, Burlington focused on the Wilson lease.

### B. The 1978 Farmout Agreement

█ In 1977, Aztec merged into Southland Royalty Company, one of Burlington's predecessors. In 1978, Southland entered into a farmout agreement[3] with

---

2. "In an area of mutual interest agreement, the parties attempt to describe a geographic area within which they agree to share certain additional leases acquired by any of them in the future. This necessarily contemplates that oil and gas leasehold interests will be conveyed." *Westland Oil Dev. Corp. v. Gulf Oil Corp.*, 637 S.W.2d 903, 905 (Tex.1982).

3. " 'A farmout is a common form of agreement between operators, in which a lease owner that does not want to drill assigns the lease, or some portion of it, to another operator that does.' " *Clayton Williams Energy, Inc. v. BMT O & G TX, L.P.*, 473 S.W.3d 341, 346 (Tex.App.—El Paso 2015, pet. filed) (quoting *Young Ref. Corp. v. Pennzoil Co.*, 46 S.W.3d 380, 389 (Tex.App.—Houston [1st Dist.] 2001, pet. denied)). " 'The primary

Petromark Minerals, Inc., Woodbine's predecessor-in-interest, "for the drilling of test wells in search for oil and gas" on the nine leases that were the subject of the Original Agreement and within the AMI. Under this farmout agreement, Petromark assumed Southland's position under the joint operating agreement with Buttes and participated in drilling wells at its own cost.

The farmout agreement provided, "As each well is completed as a producer of oil or gas in which Petromark has participated and a unit is declared around same, Southland shall issue Petromark an assignment in recordable form of the portion of said leases that are included in such unit." It further stated, "Prior to such times as such unit is declared or field rules are established for each such well in which Petromark has participated, Petromark shall be considered as the owner of its proportionate undivided interest in each such well and a proportionate part of all production therefrom."

As of 1978, there were two producing wells on the Wilson lease. Southland excepted certain existing wells from the farmout agreement, including the James D. Wilson #2 well. Buttes subsequently acknowledged that Petromark had a working interest in the Wilson lease, although a formal assignment was not completed.

## C. The 1994 Assignment

In 1994, Southland, as assignor, entered into the assignment and bill of sale which is at the heart of this controversy. At the very top of the 1994 assignment are these words: "Well Name: BUCHANAN 1, GIBBS BROS. 1, WILSON JAMES 2 AND WILSON JAMES 3." It conveyed to Samson Resources Company all of the assignor's rights, title, and interest in and to the following:

(i) The oil and gas leases, leasehold interests, rights and interests attributable or allocable to the oil and gas leases or leasehold interests by virtue of pooling, unitization, communitization, and operating agreements, licenses, permits, and other agreements, all more particularly described on Exhibit "A" hereto, limited as to the lands and depth indicated on Exhibit "A" (collectively the "Leases"), together with identical undivided interests in and to all the property and rights incident thereto, including, but not limited to, all rights in, to[,] and under all agreements, product purchase and sale contracts, leases, permits, rights-of-way, easements, licenses, farmouts, options, order, and other contracts or agreements of a similar nature to the extent same relate to the Leases;

(ii) The wells, equipment, materials and other personal property, fixtures and improvements on the Leases as of the Effective Date ... appurtenant thereto or used or obtained in connection with the Leases....'

The 1994 assignment also contained the following language:

Assignor reserves and retains unto itself from the Interest those certain lands,

---

characteristic of the farmout is the obligation of the assignee to drill one or more wells on the acreage as a prerequisite to completion of the transfer.'" *Id.* (quoting *Young Refining Corp.*, 46 S.W.3d at 389). "In essence, an oil company will reward another operator who fulfills its lease obligations with a sublease or rights assignment, often as a way to fulfill its contractual with the landowner while sharing financial risks of drilling operations and increasing its ability to profit off of petroleum products it may not be equipped to market by including a third party in the deal." *Id.* (citing John S. Lowe, *Analyzing Oil and Gas Farmout Agreements,* 41 Sw. L.J. 759, 778–81 (1987)).

leases, properties, interests, leasehold rights, depths[,] or formations as specifically noted and reflected on Exhibit "A", and the right of joint use of any agreements assigned hereunder where needed for the exploration, development, and operation of any rights or acreage (either horizontally or vertically) retained by Assignor or where needed in order to exercise ancillary rights in, or for access to, adjoining or nearby properties owned by Assignor.

As shown by the language above, Exhibit A contained both the conveyances and reservations made in the 1994 assignment. The table from Exhibit A is reproduced below, in relevant part:

| TYPE INSTRUMENT | INST DATE. | GRANTOR LESSOR | RECORDING DATA. | LEGAL DESCRIPTION. |
|---|---|---|---|---|
| OIL AND GAS LEASE | 10/08/74 | HENRY K. ODOM, ET UX | 21/661 BRAZOS COUNTY | 943 ACRES, MORE OR LESS, DESCRIBED IN LEASE. |
| OIL AND GAS LEASE | 08/14/74 | GIBBS BROTHERS AND COMPANY | 203/414 MADISON COUNTY | 184.1 ACRES, MORE OR LESS, DESCRIBED IN LEASE. |
| OIL AND GAS LEASE | 08/29/74 | JAMES D. WILSON, IND. & IND. EX. | 203/464 MADISON COUNTY, 21/667 BRAZOS COUNTY | 2072.33 ACRES, MORE OR LESS, DESCRIBED IN LEASE. |
| OIL AND GAS LEASE | 10/11/74 | RAYMOND B. BUCHANAN, ET UX | 21/679 BRAZOS COUNTY | 222.06 ACRES, MORE OR LESS, DESCRIBED IN LEASE. LESS AND EXCEPTED FROM THE ABOVE ARE THE LANDS ATTRIBUTABLE TO THE H. K. ODOM WELLS, JAMES D. WILSON #4 WELL AND THE BUCHANAN #2 WELL. |

ASSOCIATED WELLS:

| PROPERTY NUMBER | DP WELL NUMBER | WELL NAME | LOCATION |
|---|---|---|---|
| 21188 | 24300 | GIBBS BROS 1 | A. MUNLEY SVY., A-176 |
| 21189 | 1409,81464 | WILSON JAMES D #3 | JESSE K. DAVIS SVY. A-103 |
| 21189 | 85900 | WILSON JAMES D #2 | JESSE K. DAVIS SVY., A-103 |
| 21195 | 6900 | BUCHANAN 1 | HARDIN NEVELLE SVY., A-185 |

## E. The 1997 Assignment

In 1996, Southland merged into Meridian Oil, Inc., which changed its name to Burlington Resources Oil & Gas Co., and subsequently converted to Burlington Resources Oil & Gas L.P., its current incarnation. In 1997, Burlington assigned and conveyed to Tri–Union Development Corporation all of its "right, title and interest in and to an overriding royalty interest ... derived under the oil and gas leases, pooling or unitization agreements, assignments, or other contracts or agreements of a similar nature which created an Overriding Royalty as described on Exhibit 'A.'" Page 1 of Exhibit A described the conveyed interest as the interest set forth in the 1978 farmout agreement between Southland and Petromark, "INSOFAR AND ONLY INSOFAR AS SAID FARMOUT AGREEMENT AFFECTS THE FOLLOWING OIL AND GAS LEASES:"

| CO FILE NO. | TYPE INSTR | INST DATE | GRANTOR/LESSOR | LEGAL DESCRIPTION |
|---|---|---|---|---|
| 02115500 | OIL AND GAS LEASE | 10/11/74 | RAYMOND B. BUCHANAN, ET UX | INSOFAR AND ONLY INSOFAR AS SAID LEASE COVERS THE WELLBORE OF THE RAYMOND BUCHANAN NO. 2 WELL AND ANY ACREAGE ATTRIBUTABLE THERETO AS STIPULATED AND DEFINED IN THAT CERTAIN FARMOUT AGREEMENT DATED APRIL 11, 1978 BETWEEN SOUTHLAND ROYALTY COMPANY AND PETROMARK MINERALS, INC., ALL LOCATED IN BRAZOS COUNTY, TEXAS. |
| 02115930 | OIL AND GAS LEASE | 08/29/74 | JAMES D. WILSON, INDIVIDUALLY AND AS INDEPENDENT EXECUTOR AND TRUSTEE | INSOFAR AND ONLY INSOFAR AS SAID LEASE COVERS THE WELLBORE OF THE JAMES D. WILSON NO. 4 WELL AND ANY ACREAGE ATTRIBUTABLE THERETO AS STIPULATED AND DEFINED IN THAT CERTAIN FARMOUT AGREEMENT DATED APRIL 11, 1978 BETWEEN SOUTHLAND ROYALTY COMPANY AND PETROMARK MINERALS, INC., ALL LOCATED IN BRAZOS COUNTY, TEXAS. |
| 02114780 | OIL AND GAS LEASE | 10/08/74 | HENRY K. ODOM, ET UX | INSOFAR AND ONLY INSOFAR AS SAID LEASE COVERS THE WELLBORE OF THE HENRY K. ODOM NO. 2 WELL AND ANY ACREAGE ATTRIBUTABLE THERETO AS STIPULATED AND DEFINED IN THAT CERTAIN FARMOUT AGREEMENT DATED APRIL 11, 1978 BETWEEN SOUTHLAND ROYALTY COMPANY AND PETROMARK MINERALS, INC., ALL LOCATED IN BRAZOS COUNTY, TEXAS. |
| 02114700 | OIL AND GAS LEASE | 10/08/74 | HENRY K. ODOM, ET UX | INSOFAR AND ONLY INSOFAR AS SAID LEASE COVERS THE WELLBORE OF THE HENRY K. ODOM NO. 4 WELL AND ANY ACREAGE ATTRIBUTABLE THERETO AS STIPULATED AND DEFINED IN THAT CERTAIN FARMOUT AGREEMENT DATED APRIL 11, 1978 BETWEEN SOUTHLAND ROYALTY COMPANY AND PETROMARK MINERALS, INC., ALL LOCATED IN BRAZOS COUNTY, TEXAS. |

ASSOCIATED WELLS.

The 1997 assignment demonstrated that the overriding royalty interest in the Wilson #4 and Buchannan #2 wells, both excepted from the 1994 assignment, were conveyed. In its responses to requests for admissions, Burlington admitted that it had no interest in either the Wilson #4 well or the Wilson #2 well. The Odom Lease, which was a part of the AMI, expired upon cessation of production in 1999.

### F. Appellees' Operate as if Burlington Has an Interest in the AMI

In 2007, J. Jan Jircik, an attorney retained by the Appellees, conducted a title examination which dealt with this issue and concluded that Burlington still had working interests in the Wilson lease.[4] In 2009, under the Original Agreement, Buttes' successor-in-interest, TexCal, sent Burlington notice that it proposed to drill a well on the Wilson lease (Wilson #1H).

TexCal gave Burlington, which had since been acquired by ConocoPhillips, thirty days in which to indicate whether it would either participate in the project or would go non-consent (meaning that it would "not participate pursuant to the application operating agreement governing the proposed well"). Internal emails from ConocoPhillips stated that it could not confirm whether it owned any interest in this portion of the lease, did not want to be bound by the terms of the joint operating agreement, and decided to go non-consent. For example, an interoffice memo on ConocoPhillips letterhead discussed the 1994 assignment and concluded, "The system and files reflect that this Assignment conveyed all interest in the primary lease. All systems and files show that [Burlington] does not have any interest in the proposed lease.... A letter was sent to the ballot-

---

4. Attorney Ronald Moore, who was hired by Petromax, reached the same conclusion in 2009.

ing party that [Burlington] maintains it does not have an interest in the proposed well."

In 2009, TexCal, entered into a farmout agreement with PetroMax on the Wilson lease, with the exceptions of the Wilson 1, 2, 3, and 4 wells.[5] In 2011, PetroMax, Petro Texas, CH4, and Petromax Production sold several oil and gas leases, including portions of the Wilson lease, to Woodbine. An exhibit to this sale stated,

> Burlington Oil & Gas Company owns an undivided 25% interest in and to 1537.83 acres out of that certain Oil and Gas Lease dated August 29, 1974, between James D. Wilson, as Lessor, and Curran R. Campbell, Inc., as Lessee, recorded in Volume 21, Page 667 of the Oil and Gas Records of Brazos County, Texas, and in Volume 203, Page 464 of the Deed Records of Madison County, Texas.... This is an outstanding interest that has been non-consented in both the Wilson #1H and Wilson #2H Wells. It is anticipated that Burlington (now Conoco–Phillips) will continue to go nonconsent on future wells.

Yet, Woodbine continued to send proposals for wells on the Wilson lease to Burlington, and Burlington elected to participate on some occasions.

In 2012, Woodbine completed a title review of its leasehold interests, including the Wilson lease, and concluded that the Jirick title examination was incorrect. Woodbine's new examination concluded that Burlington no longer owned an interest in the Wilson lease. Because Burlington had agreed to participate in the drilling of the Wilson #5H well and had paid its portion of the expenses as set forth in the joint operating agreement, Woodbine sent Burlington a check to reimburse the

amount paid by Burlington. Burlington refused to accept the return of its investment in the Wilson #5H well and sued Appellees after it did not receive its alleged proportional share of the proceeds from the production.

## G. Procedural History

Arguing that it still owned an interest in the AMI, and specifically in the Wilson lease, Burlington sought to quiet title and sued the Appellees based on Burlington's belief that the Appellees had acquired and held interests in which Burlington had a twenty-five percent claim and that the Original Agreement had been breached by the Appellees' failure to provide Burlington with offers to participate.[6] Burlington filed a motion for partial summary judgment directed at Woodbine and PetroMax seeking declarations that

1) The Area Of Mutual Interest Of The January 7, 1975, Letter Agreement Remains In Force And Effect, 2) Burlington Jointly Owns A Leasehold Interest Within The Area Of Mutual Interest[,] and 3) Burlington's Rights Under The 1975 Letter Agreement And AMI Are Not Subject To Reduction Or Limitation Based On The Amount Of Burlington's Leasehold Ownership....

In response, citing to the 1994 assignment, the Appellees filed a motion for summary judgment on Burlington's claims on the theory that the evidence conclusively established that Burlington no longer owned any interest in the AMI, arguing that when Burlington made the 1994 assignment of the Gibbs, Buchanan, and Wilson leases (reserving only the Wilson #4 and the Buchanan #2 wells), that 1994 assignment operated to convey Burlington's rights in the AMI. Burlington countered by arguing that the 1994 assignment

---

**5.** In 2009, TexCal amended the farmout agreement to include the Wilson #5 well.

**6.** Burlington also brought claims for conversion and breach of the duty to pay proceeds.

conveyed only the interests in four wells and that Burlington's predecessor, Southland, reserved its remaining interests in the leasehold estates.

Disagreeing with Burlington's interpretation of the 1994 assignment, the trial court denied Burlington's motion for partial summary judgment on its declaratory judgment claims and granted Appellees' motion for summary judgment. It then severed the parties' remaining claims in order to render its summary judgment rulings final. On appeal, Burlington argues that the trial court erred in (1) determining that Appellees were entitled to summary judgment and (2) in denying its motion for partial summary judgment on its declaratory judgment claims.

## II. Standard of Review

"We conduct a de novo review of a summary judgment." *Navasota Res., L.P. v. First Source Tex., Inc.*, 249 S.W.3d 526, 532 (Tex.App.—Waco 2008, pet. denied) (citing *Valence Operating Co. v. Dorsett*, 164 S.W.3d 656, 661 (Tex.2005)). "To prevail on a traditional summary judgment motion, the movant must demonstrate that there are no genuine issues of material fact and that it is entitled to judgment as a matter of law." *Id.* (citing *Diversicare Gen. Partner, Inc. v. Rubio*, 185 S.W.3d 842, 846 (Tex.2005)).

" '[W]e take as true all competent evidence favorable to the nonmovant, and we indulge every reasonable inference and resolve any doubts in the nonmovant's favor.' " *Id.* (alteration in original) (quoting *Rubio*, 185 S.W.3d at 846). "When competing motions for summary judgment are filed and some are granted while others denied, the general rule is that the appel-

late court should determine all questions presented and render the judgment the trial court should have rendered." *Id.* (citing *Tex. Workers' Comp. Comm'n v. Patient Advocates of Tex.*, 136 S.W.3d 643, 648 (Tex.2004); *Am. Hous. Found. v. Brazos Cnty. Appraisal Dist.*, 166 S.W.3d 885, 887 (Tex.App.—Waco 2005, pet. denied)).

## III. Summary Judgment in Favor of Appellees Was Proper

Burlington and the Appellees agree that the central issue in this case involves the interpretation of the 1994 assignment and whether it conveyed Burlington's ownership interest in the Wilson lease, as described by Exhibit A to the 1994 assignment. Appellees argue that the 1994 assignment and Exhibit A are subject to only one interpretation: that Burlington's interest in the leases were conveyed, with the exception of the lands attributable to the Odom, Wilson # 4 and Buchanan # 2 wells, and that the list of "Associated Wells" listed the wells that were included in the conveyance. Burlington argues that the 1994 assignment creates an ambiguity because Exhibit A to that assignment sets forth both the interests conveyed and the interests reserved by the assignor (Burlington) without clearly specifying which interests were conveyed and which were retained. Alternatively, Burlington argues that its interpretation is the correct one. We address these arguments in turn.[7]

"In construing the written agreement, the primary concern of the court is to ascertain the true intentions of the parties as expressed within the four corners of the instrument." *Simmons v. Blackstone Developers, LLC*, No. 10–14–00228–CV,

7. Burlington admitted that it was required to have an interest in one of the original nine leases in order to be a party to the 1975 Original Agreement. Both Exhibit A of the

Original Agreement and Exhibit A of the 1994 assignment described the Wilson lease as the lease recorded in volume 21, page 667 of the Madison County property records.

2014 WL 7232241, at *2 (Tex.App.—Waco Dec. 18, 2014, no pet.) (mem.op.) (citing *Coker v. Coker,* 650 S.W.2d 391, 393 (Tex. 1983); *Calpine Producer Servs., L.P. v. Wiser Oil Co.,* 169 S.W.3d 783, 787 (Tex. App.—Dallas 2005, no pet.)). " 'We consider the entire writing and attempt to harmonize and give effect to all the provisions of the contract by analyzing the provisions with reference to the whole agreement.' " *Id.* (quoting *Frost Nat'l Bank v. L & F Distribs., Ltd.,* 165 S.W.3d 310, 312 (Tex.2005) (per curiam)).

"Whether a contract is ambiguous is a question of law for the court." *Fox v. Parker,* 98 S.W.3d 713, 719 (Tex. App.—Waco 2003, pet. denied) (citing *Heritage Res., Inc. v. NationsBank,* 939 S.W.2d 118, 121 (Tex.1996)). "[I]f the express wording is subject to two or more reasonable interpretations, the contract is ambiguous." *Id.* (citing *Nat. Union Fire Ins. v. CBI Indus.,* 907 S.W.2d 517, 520 (Tex.1995); *Coker,* 650 S.W.2d at 393). " 'Patent' ambiguities are those which are apparent from the face of the contract." *Id.* (citing *CBI Industries,* 907 S.W.2d at 520). " 'Latent' ambiguities arise when an apparently unambiguous contract is applied to its subject matter and an ambiguity appears." *Id.* (citing *CBI Industries,* 907 S.W.2d at 520). "If the court finds that a contract is ambiguous, either patently or latently, the goal then is to determine the true intentions of the parties, for that will resolve the ambiguity." *Id.* "This determination involves fact issues." *Id.* (citing *Columbia Gas Trans. Corp. v. New Ulm Gas,* 940 S.W.2d 587, 589 (Tex.1996)). However, "[t]he construction and meaning of an unambiguous contract is a question of law." *Simmons,* 2014 WL 7232241, at *2 (citing *Ganske v. Spence,* 129 S.W.3d 701, 707 (Tex.App.—Waco 2004, no pet.)).

The first words on the 1994 assignment are "Well Name: BUCHANAN 1, GIBBS BROS 1, WILSON JAMES 2 AND WILSON JAMES 3." In this assignment, the assignor (Burlington's predecessor in title) conveyed all of its "right, title and interest" to "[t]he oil and gas leases, leasehold interests, rights and interests ... all more particularly described on Exhibit 'A' (collectively the "Leases")." The agreement also conveyed "[t]he wells, equipment, materials and other personal property ... on the Leases as of the Effective Date." The 1994 assignment also reserved to the assignor "certain lands, leases, properties, interests, leasehold rights, depths or formations as specifically noted and reflected on Exhibit 'A.' "

The top portion of Exhibit A listed the Gibbs, Wilson, Buchanan, and Odom leases, referred to them as "OIL AND GAS LEASE[S]," and provided legal descriptions for the leases that were identical to the legal descriptions of the AMI in the Original Agreement. We refer to this portion of Exhibit A as the "Lease Description." On the right side of Exhibit A, underneath the legal description of the last listed lease, the Exhibit contains the following note which we refer to as the "Exception Clause": "LESS AND EXCEPTED FROM THE ABOVE ARE THE LANDS ATTRIBUTABLE TO THE H.K. ODOM–WELLS, JAMES D. WILSON # 4 WELL AND THE BUCHANAN # 2 WELL." Underneath the Lease Description and the Exception Clause is a list of "Associated Wells" which matches the first words in the 1994 assignment.

Appellees argue that (1) the Lease Description describes the "[t]he oil and gas leases, leasehold interests" conveyed, (2) the Associated Wells list describes the wells conveyed, and (3) the Exception Clause describes the reservation contained in the 1994 assignment. Appellees argue that Burlington conveyed all of its interests in the Wilson lease (1) because Bur-

lington relies on its interest in the Wilson lease to support its position on summary judgment, (2) Burlington admitted that it owned no interest in Wilson # 4, and (3) the Exception Clause referenced only the Wilson # 4 well in the Wilson lease. These diametrically opposed interpretations cannot both be supported under the law. Therefore, the 1994 assignment is not ambiguous. *See Roberson v. El Paso Expl. & Prod. Co., L.P.,* No. 06–12–00017–CV, 2012 WL 3805956, at *3 (Tex.App.—Texarkana Sept. 4, 2012, no pet.) (mem. op.).

 Burlington disagrees with Appellees' interpretation of the 1994 assignment.

It contends that the Lease Description is a list of interests that the assignor reserved and that the Associated Wells lists is a list of wells it conveyed.[8] In support, Burlington notes that the 1994 assignment led to confusion, caused each party to question whether Burlington had an interest in the AMI, led to title opinions reaching the conclusion that Burlington did have such and interest, and caused both parties to operate as if the Original Agreement was still in effect.

 "Terms used in [a] contract have their 'plain, ordinary, and generally accepted meaning unless the [contract] shows that the parties used them in a

---

**8.** Burlington cites to a notation on The Oil & Gas Asset Clearinghouse's letterhead and claims that Southland purchased only these wells at an auction: "BUCHANAN 1," "GIBBS BROS 1," "WILSON JAMES D O," and "WILSON JAMES D UNIT 2." Thus, Burlington argues that the 1994 assignment only conveyed an interest in the wells, not the leaseholds, because the first words on the 1994 assignment are "Well Name: BUCHANAN 1, GIBBS BROS 1, WILSON JAMES 2 AND WILSON JAMES 3." "We may consider the facts and circumstances surrounding a contract, including 'the commercial or other setting in which the contract was negotiated and other objectively determinable factors that give context to the parties' transaction.'" *Kachina Pipeline Co., Inc. v. Lillis,* 471 S.W.3d 445, 450 (Tex.2015) (quoting *Americo Life, Inc. v. Myer,* 440 S.W.3d 18, 22 (Tex. 2014)). "But while evidence of circumstances can be used to 'inform the contract text and render it capable of only one meaning,' extrinsic evidence can be considered only to interpret an ambiguous writing, not to create ambiguity." *Id.* (quoting *Myer,* 440 S.W.3d at 22). While we believe the records from The Oil & Gas Asset Clearinghouse establish that the wells were purchased at auction, they do not establish that the leases referenced in the Lease Description were not also purchased. An affidavit filed by Brian Exline, who was employed by Samson as a special projects supervisor in 1994, swore that "[t]he leases and wells that were the subject of the 1994 Samson Assignment were purchased by Samson through the September 14, 1994, auction conducted by The Oil & Gas Asset Clearinghouse. During that auction, Samson acquired a number of different interests, including the leases and wells that are the subject of the 1994 Samson Assignment." Further, Burlington does not explain how the "Wilson James D O" note in the auction record transformed into "Wilson James 3" in the 1994 assignment.

Burlington also dismisses the list of Associated Wells as some sort of inventory because it does not identify the Wilson # 1 well or the Wilson # 5 well. An interoffice memo produced by Buttes Resources Company stated that Southland had a twenty-five percent working interest in the Wilson # 1 and # 5 wells. Southland went non-consent on the Wilson # 1 well. These wells were not operated by Burlington. Other summary judgment evidence suggested that Southland did not have a working interest in Wilson # 1, and Burlington's ownership of Wilson # 1, # 1H, and # 5H wells was questioned. ConocoPhillips' landman concluded that Burlington was "unable to conclusively prove that [Burlington] as a successor in title maintain[ed] any interest in the [Wilson # 1] leasehold." Due to interoffice confusion about Burlington's interests, we need not speculate as to the reason why certain wells were omitted from the Associated Wells list. Under the plain terms of the 1994 assignment, Burlington assigned its interests (whatever they may have been at the time) in the leases, including the Wilson lease.

technical or different sense.'" *Fox*, 98 S.W.3d at 719 (second alteration in original) (quoting *Heritage Res.*, 939 S.W.2d at 121). Thus, arguments "based on 'custom in the industry' and 'trade-usage,' ... [as] aids to contract construction are not used unless a contract is ambiguous." *Id.* at 722 (citing *Transcont. Gas Pipeline v. Texaco*, 35 S.W.3d 658, 670 (Tex.App.—Houston [1st Dist.] 2000, no pet.); *Printing Ctr. of Tex., Inc. v. Supermind Pub. Co.*, 669 S.W.2d 779, 784 (Tex.App.—Houston [14th Dist.] 1984, no writ)). In other words, "[p]arol evidence is not admissible to explain the meaning of an unambiguous contract." *Tex. Utils. Elec. Co. v. City of Waco*, 919 S.W.2d 436, 439 (Tex.App.—Waco, writ denied) (citing *State Farm Mut. Auto. Ins. Co. v. Azima*, 896 S.W.2d 177, 178–79 (Tex.1995) (per curiam)).

In separate paragraphs of the 1994 assignment, the assignor clearly stated that it was conveying its interests in both leases and wells. Exhibit A contained a list of leases and a list of wells. Burlington's interpretation of the assignment does not explain the reference to the Odom lease. In other words, if Burlington's interpretation (that the Lease Description referenced the reservations made in the 1994 assignment) were correct, there would be no need to include the Odom lease or the exception of the Odom wells. Going further,

ther, because (1) the Odom lease was clearly listed on the Lease Description, (2) the Exception Clause excepted all of the assignor's interests in the wells from the Odom lease, and (3) no well from the Odom lease was listed in the Associated Wells, we find that inclusion of the Odom lease in the Lease Description means that the Exception Clause was a reference to the reservation contained in the 1994 assignment. Moreover, if the Lease Description was (as argued by Burlington) itself a description of a reservation, the Exception Clause excepting "FROM THE ABOVE" lands attributable to wells not listed in the Associated Wells section[9] would be superfluous. Also, if the only interests conveyed were the four wells and their associated production units, the separate paragraph conveying "[t]he oil and gas leases, leasehold interests, rights, and interests attributable or allocable to the oil and gas leases or leasehold interests" would not be needed.

"A reservation of minerals to be effective must be by clear language. Courts do not favor reservations by implication." *Sharp v. Fowler*, 151 Tex. 490, 252 S.W.2d 153, 154 (Tex.1952); *Roberson*, 2012 WL 3805956, at *3. In light of the plain reading of the four corners of the 1994 assignment, we cannot find Burlington's interpretation to be reasonable.[10] Instead, we determine

---

9. "An exception is no more than an exception from the grant; it can operate to the benefit of the grantor to the extent that ownership in the excepted interest is vested in the grantor and is not outstanding in another person." *Bright v. Johnson*, 302 S.W.3d 483, 488 n. 4 (Tex.App.—Eastland 2009, no pet.). "The practical distinction between a reservation and exception is questionable today." *Id.* at 495 n. 4 (Strange, J., dissenting) (citing *Pich v. Lankford*, 157 Tex. 335, 302 S.W.2d 645, 650 (1957) (noting that the words "exception" and "reservation" are not strictly synonymous but are often used interchangeably); *Reynolds v. McMan Oil & Gas Co.*, 11 S.W.2d 778, 781 (Tex.Comm'n App.1928, holding approved)

(for purpose of determining extent of grant, distinction between an exception and reservation is of no practical importance, for property excepted or estate reserved is never included in grant); 8 HOWARD R. WILLIAMS & CHARLES J. MEYERS, OIL AND GAS LAW 336 (2008) (distinction between exceptions and reservations has lost most of its importance in contemporary law)).

10. Burlington also argues that under the 1978 farmout agreement, Petromark had earned its interests in the Buchanan # 2 and Wilson # 4 wells. Thus, it argues that the Exception Clause could not reference the reservation because if Southland did not own the inter-

that the trial court properly (1) concluded that the 1994 assignment is not ambiguous, (2) determined that the assignor assigned its interest in the remaining leases that were a part of the AMI, and (3) found that the AMI expired. Thus, we find that the trial court's grant of the Appellees' summary judgment motion was proper.

## IV. Our Holding on Burlington's First Point is Dispositive of This Appeal

Next, Burlington argues that the trial court erred in denying its motion for summary judgment, which asked for a declaration that "Burlington's Rights Under The 1975 Letter Agreement And AMI Are Not Subject To Reduction Or Limitation Based On The Amount Of Burlington's Leasehold Ownership." The Original Agreement provided that the AMI would "last as long as leases are jointly owned within such area." We have determined that the AMI terminated because Burlington assigned its interests in the portion of the AMI that still exists today. We find this ruling dispositive of Burlington's second point, which we overrule.

## V. Conclusion

We affirm the trial court's judgment.

ests in these wells, it could not reserve these interests to itself. However, Southland did not formally execute these assignments to Petromark. Woodbine, as successors-in-interest to Petromark, have filed counterclaims seeking to resolve this matter. Further, in the 1997 assignment, Burlington conveyed overriding royalty interests associated with Buchanan #2 and Wilson #4 to Tri–Union, while reserving to itself

> (i) any interest in and to the fee minerals from which the Overriding Royalty or Leases are derived, (ii) any and all royalties, non-participating term royalties, shut-in

royalties, production payments, leasehold working interest or net revenue interest in production or any other interest in and to the Leases, other than the Overriding Royalty conveyed herein ... and (iii) any executive rights with respect to the Leases, including, but not limited to, any right to participate in the making or amending of any oil and gas lease relating to Assignor's Reserved Interests covered by the Leases ... or to receive any bonus or bonuses which may be paid ... under the provisions of the Leases, now or hereafter.